# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 4, 2017           Decided May 23, 2017

No. 16-1092

DELAWARE RIVERKEEPER NETWORK AND MAYA VAN ROSSUM, THE DELAWARE RIVERKEEPER, PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION, RESPONDENT

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC, INTERVENOR

———

On Petition for Review of Orders of the Federal Energy Regulatory Commission

———

*Aaron Stemplewicz* argued the cause and filed the briefs for petitioners.

*Holly E. Cafer*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Robert H. Solomon*, Solicitor, and *Lisa B. Luftig*, Attorney. *Karin L. Larson*, Attorney, Federal Energy Regulatory Commission, entered an appearance.

*John F. Stoviak* argued the cause for intervenor. With him on the brief were *Pamela S. Goodwin*, *Elizabeth U. Witmer*, and *Patrick F. Nugent*.

Before: GARLAND, *Chief Judge*, GRIFFITH, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

EDWARDS, *Senior Circuit Judge*: This case involves three federal statutes: the Natural Gas Act ("NGA"), 15 U.S.C. § 717, *et seq.*; the Clean Water Act ("CWA"), formally titled the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251, *et seq.*; and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.* Although the Federal Energy Regulatory Commission ("FERC" or "Commission") administers only the NGA, all three statutes apply to the disputed actions taken by the Commission in this case.

On September 30, 2013, Transcontinental Gas Pipe Line Company, LLC ("Transco") filed an application with FERC to construct and operate its proposed Leidy Southeast Project ("Leidy Project"). The project was designed to expand the capacity of Transco's existing natural gas pipeline and add new facilities in Pennsylvania and New Jersey. Pursuant to the requirements of NEPA, FERC conducted an environmental review of the project and issued an environmental assessment ("EA") on August 11, 2014. The EA found, with appropriate mitigating measures, "no significant impacts" associated with the Leidy Project. However, it required Transco to obtain "all applicable authorizations required under federal law" prior to FERC authorizing construction. Because it was understood that the Leidy Project might result in discharges into navigable waters, Transco was obligated by § 401 of the CWA to obtain a water quality certification from the state in which the discharge would originate before FERC could authorize any

activity that "may result" in such a discharge. *See* 33 U.S.C. § 1341(a)(1). The EA thus in turn required Transco to obtain this state certification before FERC would authorize any construction.

On June 10, 2014, Transco applied for a § 401 certification from Pennsylvania's Department of Environmental Protection. On December 18, 2014, before Pennsylvania had acted on Transco's application, FERC issued a Certificate of Public Convenience and Necessity ("Certificate Order") under the NGA conditionally approving the Leidy Project. The Certificate Order made it clear that FERC would not authorize any construction until Transco had obtained a § 401 certification from Pennsylvania. Delaware Riverkeeper Network, a nonprofit organization, timely sought rehearing of the Certificate Order before the Commission. FERC denied the request for rehearing. Delaware Riverkeeper Network and Maya van Rossum, the current Delaware Riverkeeper (together "Riverkeeper"), then petitioned for review in this court. Transco intervened in support of the Commission.

Before this court, Riverkeeper contends that the Commission violated the CWA because it granted Transco's request to construct and operate the Leidy Project prior to the issuance of Pennsylvania's § 401 water quality certification. Riverkeeper also claims that the Commission violated NEPA in failing to establish an accurate baseline from which to conduct its environmental review of the Leidy Project. In particular, Riverkeeper argues that FERC misidentified numerous specially protected wetlands, and miscalculated both the cover type categorization of those wetlands and the total acreage of those wetlands. We find no merit in these claims and, therefore, reject the petition for review.

## I. BACKGROUND

### A. Statutory Background

Under the NGA, a natural gas pipeline company must obtain a Certificate of Public Convenience and Necessity from FERC prior to "undertak[ing] the construction or extension" of any natural gas facility for the transportation of natural gas in interstate commerce. 15 U.S.C. § 717f(c)(1)(A). FERC may place any reasonable conditions on the issuance of such a certificate "as the public convenience and necessity may require." *Id.* § 717f(e). This court has jurisdiction to review challenges to certificates granted under the NGA, but petitioning parties must first seek rehearing before the Commission and may not raise any argument before this court that was not raised on rehearing. *See* 15 U.S.C. § 717r(b). Letter orders issued by FERC are also subject to review in this court subject to the same rehearing requirement. *See* 18 C.F.R. § 385.1902.

In addition to the requirements of the NGA, § 401 of the CWA requires "[a]ny applicant for a Federal license or permit to conduct any activity including . . . the construction or operation of facilities, which may result in any discharge into the navigable waters," to "provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate." 33 U.S.C. § 1341(a)(1). The state must certify "that any such discharge will comply" with the CWA's effluent limitations and other pollutant control requirements, including state-administered water quality standards. *Id.* The state may certify that there are no applicable limitations or standards for the discharge activity, or it may deny certification or waive the certification requirement. *Id.* But "[n]o license or permit shall be granted until the certification . . . has been obtained or has been waived." *Id.* Any

limitation in a § 401 certification "shall become a condition" of the federal license or permit requiring such certification. *Id.* § 1341(d).

Section 401 is an important part of the CWA, in which "Congress sought to expand federal oversight of projects affecting water quality while also reinforcing the role of States as the prime bulwark in the effort to abate water pollution." *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 971 (D.C. Cir. 2011) (citation and internal quotation marks omitted). The state certification authority under § 401 is "'[o]ne of the primary mechanisms' through which [states] may exercise this role, as it provides them with 'the power to block, for environmental reasons, local water projects that might otherwise win federal approval.'" *Id.* (quoting *Keating v. FERC*, 927 F.2d 616, 622 (D.C. Cir. 1991)).

The last statute at issue in this case is NEPA, which was enacted in part to "promote efforts which will prevent or eliminate damage to the environment and biosphere . . . [and] enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. As we recently explained:

> The Commission, in exercising its . . . authority, must comply with NEPA and its implementing regulations, which require that all federal agencies include an environmental impact statement ("EIS") "in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1508.11. To determine whether an EIS is necessary, an agency first prepares an environmental assessment, 40 C.F.R. § 1508.9, which must include, among other information, a discussion

> of "the environmental impacts of the proposed action," *id.* § 1508.9(b). "Indirect effects . . . are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id*. § 1508.7; *see also id*. § 1508.8. After preparing an environmental assessment, an agency may conclude that the proposed action would have no significant impact (often referred to as a "FONSI," for "finding of no significant impact") in lieu of issuing an EIS. *Id.* §§ 1508.9(a)(1), 1508.13.

*Sierra Club v. FERC*, 827 F.3d 59, 63 (D.C. Cir. 2016). For either an EA or an EIS, the purposes of NEPA require the Commission to "consider and disclose" the environmental effects of the actions it certifies. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 96 (1983). So long as the agency takes a hard look at the environmental consequences, NEPA "does not mandate particular results." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

## B. Factual and Procedural Background

Transco maintains an interstate natural gas pipeline that runs from Texas to New York City, passing through Pennsylvania. In September 2013, Transco applied to FERC for a Certificate of Public Convenience and Necessity for the Leidy Project, which would add approximately thirty miles of looping to Transco's existing pipeline in Luzerne and Monroe Counties, Pennsylvania and parts of New Jersey, to meet

increasing energy demands. On August 11, 2014, FERC issued a finding of no significant impact and published its review of the environmental consequences of the Leidy Project in a 217-page EA. Environmental Assessment, Joint Appendix ("JA") 168–331. Among a number of conditions, Environmental Condition No. 9 of the EA required Transco to obtain and file with the Secretary of the Commission "all applicable authorizations required under federal law (or evidence of waiver thereof)" prior to FERC authorizing construction. *Id.* at 324. The EA identified § 401 state water quality certifications as required authorizations. The EA also discussed mitigation for the Leidy Project's impact on Pennsylvania wetlands and concluded that the project's proposed pipeline gas flow velocities were safe.

Transco had timely applied for a § 401 certification from Pennsylvania's Department of Environmental Protection on June 10, 2014. However, on December 18, 2014, FERC issued a Certificate Order to Transco, conditionally approving the Leidy Project, before Pennsylvania had acted on Transco's § 401 request. The Certificate Order adopted the conditions of the EA, including Environmental Condition No. 9, which clearly stated that Transco was required to obtain all applicable federal authorizations, including a § 401 certification from Pennsylvania. FERC was thus clear that it would not authorize any construction before the necessary § 401 certifications had been obtained. On January 16, 2015, Riverkeeper sought rehearing of the Certificate Order before the Commission.

During the early months of 2015, after the conditional Certificate Order had been issued, the Commission authorized Transco via letter orders to conduct certain "pre-construction" activities, including tree-felling. Riverkeeper moved the Commission to stay the tree-felling activity. FERC denied this request. Riverkeeper never sought rehearing of this action or of

any of FERC's letter orders. Instead, on March 15, 2015, Riverkeeper filed a petition for an emergency stay with this court. The Petition was denied on March 19, 2015. *Del. Riverkeeper Network v. FERC*, No. 15-1052 (D.C. Cir. Mar. 19, 2015), ECF No. 1543345. By the end of March 2015, Transco had begun felling trees, as authorized, along a right-of-way by the projected pipelines, including in Pennsylvania wetlands.

On April 6, 2015, Pennsylvania's Department of Environmental Protection issued a § 401 certification for the Leidy Project. Riverkeeper challenged the Pennsylvania certification by filing a petition for review in the Third Circuit, but the petition was denied. *Del. Riverkeeper Network v. Sec'y Penn. Dep't of Envtl. Prot.*, 833 F.3d 360, 385–88 (3d Cir. 2016) (upholding Pennsylvania's decision to issue the § 401 certification).

On March 3, 2016, FERC denied Riverkeeper's request for rehearing. Riverkeeper timely petitioned this court for review of FERC's EA, Certificate Order, and order denying rehearing. Transco intervened.

## II. ANALYSIS

### A. Standard of Review

"[I]n evaluating the Commission's authority to issue [a] challenged certificate of public convenience and necessity[,] [w]e . . . review[] the Commission's interpretation of its authority to issue such a certificate by applying the two-step analytical framework of *Chevron*." *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1315 (D.C. Cir. 2015) (citing *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984)). Under the *Chevron* framework,

an agency's power to regulate "is limited to the scope of the authority Congress has delegated to it." *Am. Library Ass'n v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005). Pursuant to *Chevron* Step One, if the intent of Congress is clear, the reviewing court must give effect to that unambiguously expressed intent. If Congress has not directly addressed the precise question at issue, the reviewing court proceeds to *Chevron* Step Two. Under Step Two, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are . . . manifestly contrary to the statute." *Chevron*, 467 U.S. at 843–44. Where a "legislative delegation to an agency on a particular question is implicit rather than explicit," the reviewing court must uphold any "reasonable interpretation made by the administrator of [that] agency." *Id.* at 844. But deference to an agency's interpretation of its enabling statute "is due only when the agency acts pursuant to delegated authority." *Am. Library Ass'n*, 406 F.3d at 699.

EDWARDS, ELLIOTT, & LEVY, FEDERAL STANDARDS OF REVIEW 166–67 (2d ed. 2013).

A court does not defer to an agency's interpretation of a statute that it is not charged with administering. *See Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 138 n.9 (1997). Therefore, we do not accord *Chevron* deference to the Commission's interpretation of the CWA because the Environmental Protection Agency, not FERC, administers the statute. *See Alcoa Power*, 643 F.3d at 972. Our review of the requirements of the CWA is *de novo*. *Id.*

Finally, we apply "a 'rule of reason' to an agency's NEPA analysis and ha[ve] repeatedly refused to 'flyspeck' the agency's findings in search of 'any deficiency no matter how minor.'" *Myersville*, 783 F.3d at 1322–23 (citations omitted). Because "NEPA's requirements are 'essentially procedural,'" so "long as the agency's decision is 'fully informed' and 'well-considered,' it is entitled to judicial deference." *Nat. Res. Def. Council v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988) (citations omitted). Especially "[w]hen considering FERC's evaluation of 'scientific data within its technical expertise,' we afford FERC 'an extreme degree of deference.'" *Myersville*, 783 F.3d at 1308 (citation omitted).

## B.   Jurisdiction

FERC argues that Riverkeeper's Clean Water Act claim "may no longer present an ongoing case or controversy" as "[i]t is not clear what relief would be available to remedy Riverkeeper's sequencing claims—if they prevailed—where the [state] water quality certifications have been issued and affirmed on appeal [by the Third Circuit]." Br. for FERC at 22 n.3. In other words, according to FERC, even if the agency issued the conditional Certificate Order prematurely, no remedy is needed for the sequencing error because the state water quality certifications have been issued and found lawful. FERC's argument is misguided.

First, the principal issue before the Third Circuit was whether *Pennsylvania* "was required to engage in an environmental review prior to issuing a Water Quality Certification." *Del. Riverkeeper*, 833 F.3d at 385. Here, in contrast, the question raised by Riverkeeper is whether the *Commission* (not Pennsylvania) violated the sequencing requirement of the CWA by issuing its Certificate Order before Pennsylvania issued its § 401 certification. These are entirely

distinct issues and the former does not subsume the latter. FERC does not argue otherwise.

Furthermore, Riverkeeper's claim is not moot because once the CWA's sequence has been flouted, the only fix is to start the process over. Riverkeeper asks this court to "rescind[] the Commission's Orders, or remand[] the decision to ensure that the Orders comply with the [Clean Water Act] and NEPA." Br. for Pet'rs at 15. We could provide Riverkeeper the remedy it seeks by rescinding the conditional Certificate Order. That would halt the project and force FERC to follow the proper sequence of action. *See Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 272 (D.C. Cir. 2015) (rejecting similar mootness argument because granting relief on the NEPA claim would undo the conditional certificate, which could start the CWA sequence over).

Perhaps FERC means to suggest that no effectual relief can be granted because vacating the Certificate Order and remanding the matter to the agency would almost certainly have no real world consequences. In other words, in FERC's view, even if the court were to remand the case, the agency could immediately re-issue the conditional Certificate Order because the state water quality certifications have been issued. Such a response by FERC is not unlikely, but it is surely not guaranteed. In any event, "[c]ourts often adjudicate disputes where the practical impact of any decision is not assured." *Chafin v. Chafin*, 568 U.S. 165, 133 S. Ct. 1017, 1025 (2013). Therefore, we could grant Riverkeeper vacatur of FERC's conditional Certificate Order even if its victory might be short lived. "Such relief would of course not be 'fully satisfactory,' but with respect to the case as whole, 'even the availability of a partial remedy is sufficient to prevent [a] case from being moot.'" *Id*. at 1026 (quoting *Calderon v. Moore*, 518 U.S. 149, 150 (1996) (per curiam)).

In sum, we agree with Riverkeeper that we have jurisdiction to consider its challenge to the Certificate Order on the ground that FERC violated the sequencing requirement of the CWA by issuing its Certificate Order before Pennsylvania issued its § 401 certification. We therefore proceed to the merits of Riverkeeper's claims under both the CWA and NEPA.

## C.   Riverkeeper's Challenges Under the CWA

Riverkeeper argues that the Commission violated § 401 of the CWA by "issu[ing] its approval of the [Leidy] Project prior to Pennsylvania's issuance of its Clean Water Act Section 401 water quality certificat[ion]." Br. for Pet'rs at 19. We disagree. We hold that the sequencing requirement of § 401 was not triggered because the Commission's conditional approval of the Leidy Project construction did not authorize any activity which might result in a discharge in navigable waters.

We decline to review Riverkeeper's alternative CWA challenge to the letter orders approving pre-construction tree-felling. The NGA requires that, prior to challenging an order before this Court on review, a party first must file a petition for rehearing with the Commission and then specify the challenged orders in a petition for judicial review. 15 U.S.C. §§ 717r(a), (b). Because Riverkeeper failed to seek rehearing of any of the disputed letter orders authorizing pre-construction activities, those individual decisions are not properly before this court.

### 1. *The Sequencing of the Certificate Order and the § 401 Certification*

Section 401 of the CWA requires that "[a]ny applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters" must first obtain a water quality certification from the state in which the discharge will originate, and that "[n]o license or permit shall be granted until the certification required by this section has been obtained or has been waived." 33 U.S.C. § 1341(a)(1).

Transco argues preliminarily that the Commission's Certificate Order is not a "license or permit" subject to the CWA because it is a "*certificate[]* of public convenience and necessity." Br. for Transco at 16; *see id.* at 15–19. We reject this argument out of hand. The Commission agrees with Riverkeeper that its Certificate Order was a "license or permit" potentially subject to the requirements of § 401. Furthermore, Transco's assertion comes too late: before the Commission, Transco never claimed that § 401 was inapplicable and the company applied to Pennsylvania for the certification without protest. Finally, it is clear that Congress intended § 401 to apply broadly to federal approval of potential pollution activity.

The Supreme Court has noted that:

State certifications under § 401 are essential in the scheme to preserve state authority to address the broad range of pollution, as Senator Muskie explained on the floor when what is now § 401 was first proposed:

> "No polluter will be able to hide behind a Federal license or permit as an excuse for a violation of water quality standard[s]. No polluter will be able to make major investments in facilities under a

> Federal license or permit without providing assurance that the facility will comply with water quality standards. No State water pollution control agency will be confronted with a fait accompli by an industry that has built a plant without consideration of water quality requirements." 116 Cong. Rec. 8984 (1970).

> These are the very reasons that Congress provided the States with power to enforce "any other appropriate requirement of State law," 33 U.S.C. § 1341(d), by imposing conditions on federal licenses for activities that may result in a discharge, *ibid.*

*S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 386 (2006).

The CWA in its entirety "provides for a system that respects the States' concerns" in application to all federal agencies. *Id.* And the act of "licensing" or "permitting" clearly extends to "certifying," which is merely a different name for the stamp of federal approval Congress intended to capture. Transco's reliance on the doctrine of *expressio unius*, that Congress's selection of "license or permit" excludes a "certificate," is misplaced because that doctrine applies "only when 'circumstances support[] a sensible inference that the term left out must have been meant to be excluded.'" *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 933 (2017) (citation omitted). Here, the broad sweep of the statute raises no such inference.

The principal issue here is not whether FERC's disputed Certificate Order is a "license or permit" covered by the CWA, but whether it approved "activity . . . which may result in any discharge" and thus triggered the requirements of the CWA. 33 U.S.C. § 1341(a)(1). We have previously stated that the

"logically antecedent" question under § 401 is whether the disputed federal permit or license "is subject to the provisions of Section 401(a)(1)" in the first place. *North Carolina v. FERC*, 112 F.3d 1175, 1186 (D.C. Cir. 1997). If the activity that FERC approved would not result in a discharge, then the sequencing requirement of § 401 was not "trigger[ed]." *See id.* at 1188.

Here, the record indicates that the Certificate Order did not authorize any activity that could result in a discharge. Instead, the *conditional* Certificate Order was merely a first step for Transco to take in the complex procedure to actually obtaining construction approval. Br. for FERC at 25–28. And, as explained above, FERC required Transco to obtain the appropriate state agency permits, including a § 401 certification from Pennsylvania, prior to FERC granting Transco permission to proceed with activity that could result in a discharge.

Judge Rogers' concurring statement in *Gunpowder Riverkeeper*, which we adopt, disposes of Riverkeeper's claim in this case:

> The plain text of the Clean Water Act does not appear to prohibit the kind of conditional certificate the Commission issued here. On its face, section 401(a)(1) does not prohibit *all* "license[s] or permit[s]" issued without state certification, only those that allow the licensee or permittee "to conduct any activity . . . which may result in any discharge into the navigable waters." 33 U.S.C. § 1341(a)(1). Petitioner has pointed to no activities authorized by the conditional certificate itself that may result in such discharge *prior to the state approval and the Commission's issuance of a Notice to Proceed.*

807 F.3d at 279 (Rogers, J., dissenting in part and concurring in the judgment) (second emphasis added); *see also Myersville*, 783 F.3d at 1320–21 (upholding FERC's conditional approval of a natural gas facility construction project where FERC conditioned its approval on the applicant securing a required federal Clean Air Act air quality permit from the state); *Del. Dep't. of Nat. Res. & Envtl. Control v. FERC*, 558 F.3d 575, 578–79 (D.C. Cir. 2009) (holding Delaware suffered no concrete injury from FERC's conditional approval of a natural gas terminal construction despite statutes requiring states' prior approval because FERC conditioned its approval of construction on the states' prior approval).

Because the Certificate Order expressly conditioned FERC's approval of potential discharge activity on Transco first obtaining the requisite § 401 certification, and was not itself authorization of any potential discharge activity, the issuance of the Certificate Order before Pennsylvania's issuance of its § 401 certificate did not violate § 401 of the CWA.

## 2. *The Letter Orders*

Riverkeeper alternatively contends that the Commission's letter orders authorizing pre-construction tree-felling impermissibly approved activity that might have resulted in a proscribed discharge before Pennsylvania could issue its water quality certification. In response, the Commission contends that its letter orders did not trigger the requirements of § 401 because the U.S. Army Corps of Engineers determined that Transco's "proposed tree cutting activities would not result in a discharge," JA 638, and FERC relied on the Corps' determination, JA 644–45. We need not decide this issue, however, because Riverkeeper did not independently challenge the letter orders. Neither FERC nor Riverkeeper dispute that

the letter orders reflected final agency action and were separately appealable after rehearing before the Commission. *See* 18 C.F.R. § 385.1902(a)–(b). But as it conceded at oral argument and in its briefing, Reply Br. for Pet'rs at 3–5, Riverkeeper did not request rehearing of the letter orders, so the letters are not properly before us for review. *See* 15 U.S.C. § 717r(a)–(b); *see also Darby v. Cisneros*, 509 U.S. 137, 145 (1993) (recognizing the statutory rehearing requirement of § 717r as mandatory).

In sum, we need not decide whether the letter orders impermissibly approved activity that might have resulted in a discharge before Pennsylvania issued its § 401 certification.

## D. The Commission's Wetlands Analysis

Riverkeeper contends that FERC violated NEPA by misclassifying wetlands in two ways: (1) under Pennsylvania's own state classification system; and (2) under the "Cowardin" classification system. We reject both challenges. FERC did not purport to rely on Pennsylvania's classification system and Riverkeeper does not show how any misclassification under the Cowardin system was prejudicial error.

Nowhere in the EA does FERC even discuss, much less rely on, the application of Pennsylvania's system. In Appendix I, the EA includes a *secondary* reference to wetlands as either "exceptional" or "other," which is pursuant to the Pennsylvania Administrative Code. 25 Penn. Admin. Code § 105.17. *See* JA 330–31. But the wetlands discussion in the EA itself does not use the terms "exceptional" or "other," and does not refer to the Pennsylvania system at all.

As Riverkeeper concedes, FERC was not bound to use Pennsylvania's classification system. And the EA clearly

explains that the "field delineations of wetlands" in Pennsylvania were performed according to the U.S. Army Corps of Engineers' "Wetlands Delineation Manual (COE, 1987)," JA 202, and that delineated wetlands "were classified as described in Cowardin, et al., (1979)," JA 203. The EA thus classifies the wetlands as either Palustrine Forested, Palustrine Scrub-Shrub, or Palustrine Emergent wetlands. These three Palustrine wetland types are consistent with the Cowardin classification system referenced in the Corps' delineation manual. *See* U.S. ARMY CORPS OF ENG'RS, WETLANDS DELINEATION MANUAL 3 (1987); LEWIS M. COWARDIN, ET AL., CLASSIFICATION OF WETLANDS AND DEEPWATER HABITATS OF THE UNITED STATES 10–13 (1979).

On rehearing, FERC again rejected Riverkeeper's contention that the agency had used Pennsylvania's system: "As indicated in the EA and the December 18 [Certificate] Order, Transco's wetlands delineations were conducted using the Corps' Wetlands Delineation Manual." JA 716. Moreover, FERC made it clear that each state was to oversee its own delineation, clearly implying this was to be done for purposes of classification: "It is at the discretion of the Corps [and] the Pennsylvania Department of Environmental Protection . . . to determine whether Transco's wetland delineations comply with each agency's permit application process, prior to issuing the appropriate water quality permit." JA 514; *see also* JA 203 (using "delineate[]" in reference to identifying cover types). There is no evidence the secondary wetlands identifications in Appendix I as "exceptional" or "other," even if erroneous, had any effect on FERC's consideration of the environmental impact of the Leidy Project. Accordingly, there is no NEPA violation here.

Riverkeeper's second wetlands argument attacks the Cowardin classification system that the Commission actually

used. Riverkeeper contends that FERC "failed to accurately account for the expected ground disturbance impacts that will result from the [Leidy] Project's construction and operational activity," Br. for Pet'rs at 44, because it misidentified the cover types of fourteen wetlands – totaling approximately 3.8 acres that would be impacted by operation or construction – pursuant to the Cowardin system, *see id.* at 44–49. For example, Riverkeeper argues that aerial photographs show that a wetland classified as Palustrine Emergent (non-forested) was "clearly" forested and therefore should have been classified as Palustrine Forested. *Id.* at 46. However, Riverkeeper does not explain how this inexorably leads to the conclusion that FERC failed to accurately account for the Leidy Project's impact on the environment. Indeed, the ultimate implication Riverkeeper raises for this alleged erroneous classification is an "alteration of wetland value due to vegetation clearing." *Id.* at 45 (quoting JA 205). But the EA identifies only one difference in vegetation clearing: the time it takes for the three different types of wetlands to re-vegetate. *See* JA 205. Riverkeeper does not raise any unaccounted-for consequences of this. In other words, even assuming FERC misclassified a small area of Pennsylvania wetlands, this merely means the Leidy Project will result in a longer re-vegetation process for some wetlands, and a shorter re-vegetation process for others. Riverkeeper fails to explain how this caused FERC's mitigation plan to be significantly deficient.

What we see from the record in this case is that FERC responsibly addressed Riverkeeper's misclassification argument in its Certificate Order. The Commission stated that it relied on its classification only to "disclose and evaluate potential impacts on wetlands and to serve as a starting point for the development of protective mitigation." JA 514. FERC thus disclosed its methodology and purpose as a starting point for mitigation, which would subsequently involve the Corps

and state agencies to further oversee mitigation. *See id.*; JA 716–17 (order denying rehearing). It seems clear here that FERC took the requisite "hard look" at the impact of the Leidy Project on the environment. *Hodel*, 865 F.2d at 294 (quoting *Izaak Walton League of America v. Marsh*, 655 F.2d 346, 371 (D.C. Cir. 1981)). Even if FERC technically erred in some of its classifications, Riverkeeper has not shown any prejudice by virtue of the agency "fail[ing] to comply precisely with NEPA procedures." *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006); *see also Hodel*, 865 F.2d at 295–97 (refusing to remand despite an agency error because it had "serve[d] NEPA's informational function").

## E. The Commission's Gas Flow Velocity Analysis

In its final challenge, Riverkeeper contends that FERC "repeatedly failed to disclose information addressing both the safety and independent viability" of the Leidy Project's projected pipeline gas flow velocities. Br. for Pet'rs at 57. This argument rests on Riverkeeper's claims that FERC failed to consider and disclose (1) key information about Transco's projected gas flow velocities, (2) the project's interdependence on past or future pipeline projects, and (3) the safety risks of its gas flow velocities. *Id.* at 50–60. Riverkeeper also contends that FERC treated the Leidy Project differently than a similarly situated project. We find no merit in these claims.

*First*, the record belies Riverkeeper's claim that FERC withheld critical information regarding the projected gas flow velocities. Riverkeeper asserts that it never received answers to nine questions it asked, regarding, *inter alia*, data about the pipe diameter, grade, wall thickness, and gas flow rates and pressures. *Id.* at 54–55. The record shows, however, that FERC and Transco responded to Riverkeeper's queries and made it clear that the flow diagrams contained in Exhibits G and G-II

answered the questions that had been raised. JA 159. On appeal, Riverkeeper summarily asserts that the cited exhibits were non-responsive to its questions, but it does not explain how so.

In fact, the record before us shows that Riverkeeper was invited to view Transco's hydraulic flow modeling software, used to project gas flow velocity, via video conference or in person (due to the software's proprietary nature). Riverkeeper concedes that this offer was made but asserts it "made the decision" to "not waste . . . limited time and resources to fly their expert from Washington to Texas" to view the software. Reply Br. for Pet'rs at 24–25. This is hardly a compelling response, especially since Riverkeeper could have viewed the modeling software via video conferencing.

In sum, on the record before us, we have no basis upon which to credit Riverkeeper's vague and unsubstantiated assertions that FERC withheld key data from the public. Indeed, the record reflects that FERC made every effort to comply with requests for information and no information was withheld from Riverkeeper.

*Second*, Riverkeeper contends that the EA's data on the projected gas flow velocity was insufficient and, therefore, it could not review the dependence of the Leidy Project on future pipeline expansions. Riverkeeper says the information is important because FERC's regulations require the agency to review connected, cumulative, or similar actions. *See* 40 C.F.R. § 1508.25(a); *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1309 (D.C. Cir. 2014). In support of this claim, Riverkeeper points to this court's decision in *Delaware Riverkeeper Network*. That case is plainly distinguishable, however. There, the court determined that FERC had impermissibly segmented NEPA review by approving one of

four "indisputably related and significantly 'connected'" pipeline upgrade projects without looking at the projects' cumulative impact. *Id.* at 1313–14. Here, in contrast, FERC evaluated the cumulative impact of recent related projects, *see* JA 320, and found that "[t]he location of any future expansion facilities is entirely speculative." JA 499. Riverkeeper offers no evidence to the contrary.

*Third*, Riverkeeper alleges that it presented expert evidence to FERC that Transco's proposed gas flow velocities were potentially unsafe, and these concerns were left "wholly unanswered and unrebutted." Br. for Pet'rs at 57. The record indicates otherwise. The EA concluded that Transco's proposed gas flow velocities, not to exceed 60-61 feet per second, were safe based on an American Petroleum Institute report that gave a conservative guideline for maximum flow velocity as 100 feet per second for pipelines exposed to liquid droplet erosion. The Commission concluded that Transco's 60-61 feet per second maximum flow velocity was safe, especially since Transco's pipelines would not be subject to liquid droplets. JA 498. In both instances, FERC highlighted the fact that Riverkeeper did not "cite any industry or government standard, regulation, or study to support its position" when expressing its concern that gas flow velocities beyond 50 feet per second would be unsafe. JA 315; *see* JA 496. We therefore reject Riverkeeper's claims, which are based on sheer speculation, that FERC erred in its determinations regarding the safety of the Leidy Project's gas flow velocities.

*Finally*, we reject Riverkeeper's contention that FERC treated similarly situated parties differently and, therefore, the agency's determinations on gas flow velocity are arbitrary and capricious. Br. for Pet'rs at 57–60. In 2011, FERC determined that a pipeline project, the Northeast Upgrade Project, was not hydraulically feasible because its gas flow velocity would

exceed 40 feet per second. Riverkeeper thus asserts that FERC's approval of the Leidy Project's gas flow velocity of 60 feet per second is unjustified. The two projects are quite different, however. The Northeast Upgrade Project proposed adding compression to an existing 24-inch diameter pipeline, without adding additional looping. *See* Br. for FERC at 44. In contrast, the Leidy Project proposed to add looping of 42-inch diameter pipeline, nearly double that of the Northeast Upgrade Project. Riverkeeper is conspicuously silent as to these salient differences.

The Commission's NEPA review of the Leidy Project's proposed gas flow velocities appears to be fully informed and well-considered. Riverkeeper presents no countervailing evidence. As such, the Commission's judgment is "entitled to judicial deference." *Hodel*, 865 F.2d at 294.

### III. CONCLUSION

For the foregoing reasons, we deny the petition for review.

*So ordered.*