**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1047
_____

TOWNSHIP OF BORDENTOWN, NEW JERSEY;
TOWNSHIP OF CHESTERFIELD,
                                        Petitioners

v.

FEDERAL ENERGY REGULATORY COMMISSION,
                                        Respondent


Transcontinental Gas Pipe Line Company, LLC,
                                Intervenor Respondent
_____

No. 17-3207
_____

TOWNSHIP OF BORDENTOWN, New Jersey;
TOWNSHIP OF CHESTERFIELD;
PINELANDS PRESERVATION ALLIANCE,
                                        Petitioners

v.

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL
PROTECTION,

                                                  Respondent


Transcontinental Gas Pipe Line Company, LLC,
                                          Intervenor Respondent
                    _____


On Petition for Review of Orders of the Federal Energy
Regulatory Commission
(Agency Nos. FERC CPI15-89-000 and CPI15-89-001)
and of the New Jersey Department of
Environmental Protection
(Permit Nos. Nos. 0300-15-0002.2 FWW150001,
1322D DWP150001, 0300-15-0002.2 FHA150001,
and 0300-15-0002.2 FHA150002)


Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
June 11, 2018


Before:  CHAGARES, GREENBERG, and FUENTES,
Circuit Judges.


(Filed: September 5, 2018)


Jennifer Borek
Lawrence Bluestone
Genova Burns
494 Broad Street
Newark, NJ 07102
        *Counsel for Petitioner Township of Bordentown*

John C. Gillespie
Parker McCay
9000 Midlantic Drive, Suite 300
P.O. Box 5054
Mount Laurel, NJ 08054
    *Counsel for Petitioner Township of Chesterfield*

Paul A. Leodori
Todd M. Parisi
Law Offices of Paul Leodori
61 Union Street, 2nd Floor
Medford, NJ 08055
    *Counsel for Petitioner Pinelands Preservation*
    *Alliance*

David L. Morenoff
Robert H. Solomon
Susanna Y. Chu
Ross Fulton
Rekha Sherman
Federal Energy Regulatory Commission
888 1st Street, N.E.
Washington, DC 20426
    *Counsel for Respondent Federal Energy Regulatory*
    *Commission*

Gurbir S. Grewal
Jason W. Rockwell
Ryan C. Atkinson
Lewin J. Weyl
Office of Attorney General of New Jersey
25 Market Street

P.O. Box 116
Trenton, NJ 08625

> *Counsel for Respondent New Jersey Department of*
> *Environmental Protection*

Christine A. Roy
Brian B. Keatts
Richard G. Scott
Rutter & Roy
3 Paragon Way, Suite 300
Freehold, NJ 07728

> *Counsel for Intervenor Respondent Transcontinental*
> *Gas Pipe Line Co LLC*

_____

OPINION
_____

CHAGARES, <u>Circuit</u> <u>Judge</u>.

I. Introduction ............................................................5
II. Background ............................................................6
   A. Statutory Background ..........................................7
   B. Procedural History ...............................................8
III. Challenges to FERC's Orders ..............................12
   A. Interpreting the CWA .........................................12
   B. NEPA Challenges ...............................................16
      1. Segmentation of PennEast .............................17
      2. Consideration of the SRL .............................24
      3. Potable Well Impacts .....................................39
   C. Need for the Project ...........................................46

D. Good Faith Notice ..............................................49
E. Green Acres Act.................................................52
F. Cumulative Error................................................56
IV. Challenges to the NJDEP's Order.........................56
A. Jurisdiction Under the NGA..............................57
B. New Jersey Law.................................................64
V. Conclusion..........................................................69

## I. Introduction

This consolidated appeal considers a bevy of challenges brought by the Township of Bordentown, Township of Chesterfield, and Pinelands Preservation Alliance's ("PPA") (collectively, the "petitioners"), seeking to prevent the expansion of interstate natural gas pipeline facilities operated by the Transcontinental Pipe Line Company, LLC ("Transco").[1] The petitioners contend that the Federal Energy Regulatory Commission ("FERC") violated the federal statute governing the approval and construction of interstate pipelines, as well as other generally applicable federal environmental protection statutes, by arbitrarily and capriciously approving Transco's proposed project. The petitioners further maintain that the New Jersey Department of Environmental Protection ("NJDEP") violated New Jersey law by (1) improperly issuing

---

[1] All three petitioners challenge the New Jersey Department of Environmental Protection's actions, Docket No, 17-3207, but only the Townships challenge the Federal Energy Regulatory Commission's orders, Docket No. 17-1047. For convenience, we use "petitioners" interchangeably throughout the opinion to refer to both groups.

to Transco various permits that Transco was required under federal law to obtain before it could commence construction activities on the pipeline project, and (2) denying the petitioners' request for an adjudicatory hearing to challenge the permits' issuance, based only on the NJDEP's allegedly incorrect belief that the New Jersey regulations establishing the availability of such hearings were preempted by federal law.

As explained more fully below, although we conclude that the petitioners' challenges to FERC's orders lack merit, we agree that the NJDEP's interpretation of the relevant federal law was incorrect, thus rendering unreasonable the sole basis for its denial of the petitioners' request for a hearing. Given our disposition, we do not reach the petitioners' substantive challenges to the NJDEP's provision of the permits, which — assuming a hearing is granted — we leave for the NJDEP to address in the first instance. We accordingly will deny in part and grant in part the petitions for review, and we will remand to the NJDEP for proceedings consistent with this opinion.

## II. Background

This case presents challenges to both the federal and state governments' treatment of Transco's application to construct its interstate pipeline project. Before detailing the agency proceedings that preceded this appeal, we first briefly set forth the various interlocking federal and state regulatory schemes at play, which this Court has already elucidated in some detail. See Del. Riverkeeper Network v. Sec'y of Pa. Dep't of Envtl. Prot., 870 F.3d 171, 174 (3d Cir. 2017) ("Delaware II"); Del. Riverkeeper Network v. Sec'y Pa. Dep't of Envtl. Prot., 833 F.3d 360, 367–69 (3d Cir. 2016) ("Delaware I").

6

## A. Statutory Background

Under the Natural Gas Act of 1938 ("NGA"), 15 U.S.C. §§ 717–717z, FERC is tasked with regulating the construction and operation of interstate natural gas pipelines. Id. §§ 717f, 717n. If FERC determines that a given project should proceed, it will issue a "certificate of public convenience and necessity" (the "certificate"), which in turn is conditioned on the pipeline operator acquiring other necessary state and federal authorizations. See Delaware I, 833 F.3d at 367–68. Among the regulatory schemes related to the NGA are the federal environmental laws, including the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h, and the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1388. NEPA is primarily a procedural statute that requires FERC to assess "the potential environmental impact of a proposed pipeline project." Delaware I, 833 F.3d at 368. Upon completing the analysis, FERC must issue either an Environmental Assessment ("EA," if the analysis indicates that the project will have no significant environmental impacts) or an Environmental Impact Statement ("EIS," if the analysis indicates that the project will be a "'major Federal action' that would 'significantly affect[] the quality of the human environment'"). Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs, 869 F.3d 148, 152 (3d Cir. 2017) (quoting 42 U.S.C. § 4332(C)). As to the CWA, although the NGA explicitly "preempts state environmental regulation of interstate natural gas facilities," it "allows states to participate in environmental regulation of these facilities under . . . the Clean Water Act." Delaware I, 833 F.3d at 368. The CWA permits states, subject to United States Environmental Protection Agency approval, to establish their own minimum

7

water quality standards, including by regulating the discharge of pollutants into bodies of water in the state. Id.

The NGA and CWA converge where, to construct an interstate pipeline, a company must discharge into — or displace water from — the navigable waters of the United States. Before a company is permitted to undertake this activity, it must obtain a permit pursuant to Section 404 of the CWA, which itself may issue only after the company secures a state-issued Water Quality Certification, pursuant to Section 401 of the CWA, "confirm[ing] that a given facility will comply with federal discharge limitations and state water quality standards." Id.; see also 33 U.S.C. § 1341(a) ("Any applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, . . . that any such discharge will comply with the applicable [water quality] provisions . . . of this Act"). Because New Jersey has assumed permitting authority under Section 404 — implemented by the NJDEP under the framework of the New Jersey Freshwater Wetlands Protection Act ("FWPA"), N.J. Stat. Ann. § 13:9B-1 — the issuance of a Section 404 permit in New Jersey carries with it a Section 401 Water Quality Certification. N.J. Admin. Code § 7:7A-2.1(c)–(d); Delaware I, 833 F.3d at 368–69.

**B. Procedural History**

The permits at issue in this case relate to Transco's Garden State Expansion Project (the "Project"), by which Transco planned to upgrade its existing interstate natural gas pipeline system so that it could support the transportation of

8

another 180,000 dekatherms per day of capacity for natural gas from its Mainline to its Trenton–Woodbury Lateral. The Project proposed to construct a new meter and regulating station, compressor station, and electric substation along the Trenton–Woodbury Lateral in Chesterfield, New Jersey (Station 203), and to upgrade and modify the existing motor drives and compressor station located on the Mainline in Mercer County, New Jersey (Station 205).

The New Jersey Natural Gas company ("NJNG") contracted with Transco to utilize all the capacity added by the Project, for distribution via NJNG's intrastate pipeline system. In anticipation of obtaining the excess capacity, NJNG has proposed to construct the Southern Reliability Link Project ("SRL"), a 28-mile-long intrastate pipeline that would connect to Transco's Trenton–Woodbury Lateral pipeline and deliver gas south-eastward for connection into NJNG's existing system. Separately, PennEast has proposed to construct the interstate PennEast Pipeline Project, which would deliver natural gas from Pennsylvania's Marcellus Shale region and terminate at an interconnect with Transco's Mainline. NJNG has independently contracted with PennEast to purchase 180,000 dekatherms per day of the PennEast project's expected supply, for delivery to the SRL via Transco's pipeline network.[2]

---

[2] Whereas the SRL — as a purely intrastate pipeline — would not be subject to FERC's jurisdiction or oversight, the PennEast pipeline, which will traverse Pennsylvania and New Jersey, would be. See 15 U.S.C. § 717(b)–(c).

9

As required by the NGA, Transco sought and obtained from FERC a certificate of public convenience and necessity authorizing the construction of the Project, subject — as is generally the case — to Transco "receiv[ing] all applicable authorizations required under federal law." Appendix ("App.") 67. Prior to issuing the certificate, FERC conducted an environmental analysis and issued an EA concluding that, with the appropriate mitigation measures, the Project would have "no significant impact" on the environment. App. 1479; see also App. 45. FERC issued the EA in November 2015 and, after receiving comments, issued Transco the certificate in April 2016. Bordentown and Chesterfield moved FERC for a rehearing, which FERC denied in November 2016. See App. 74–97.

Because the Project would be situated in freshwater wetlands and transition areas, and the construction of the Project would require discharging fill or dredge material into navigable waters as well as the diversion of a significant volume of water, Transco applied to the NJDEP for a Freshwater Wetlands Individual Permit and Water Quality Certificate ("FWW permit") and dewatering permit, as required by the CWA and New Jersey law.[3] The NJDEP held two days of public hearings to consider the FWW permit, and received over 1,800 written comments, which included concerns raised by each of the petitioners. After obtaining

---

[3] Transco also applied for and received a Flood Hazard Area Individual Permit and Flood Hazard Area Verification, but subsequently relinquished the Permit after being able to move the Project out of the area subject to it, and the petitioners do not challenge the provision of those permits on appeal.

10

Transco's responses to the public comments, as well as its responses to the NJDEP's requests for additional information concerning possible alternative sites for an electrical substation that would be built as part of the Project, the NJDEP issued the FWW permit on March 13, 2017. Shortly thereafter — and also following a public hearing — the NJDEP on March 16, 2017 issued the temporary dewatering permit.

Pursuant to New Jersey law, the petitioners sought an adjudicatory hearing concerning each permit. Bordentown — later joined by Chesterfield and PPA — filed a request for a hearing on the FWW on March 22, 2017. On April 11, 2017, Bordentown alone also requested an adjudicatory hearing on the dewatering permit. Both requests were filed within the 30-day limitations period established under New Jersey law for seeking adjudicatory hearings. See N.J. Admin. Code §§ 7:7A-21.1(b); 7:14A-17.2(c). Bordentown asserted that it had standing under state law to challenge the permits as a third party because it had a particularized property interest affected by the Project, given that part of the project would be built on Bordentown-owned land, which Transco had acquired through eminent domain under the authority granted by the FERC certificate. See NJDEP App. 37 & n.4; 15 U.S.C. § 717f(h). On August 22, 2017, the NJDEP denied the petitioners' requests for an adjudicatory hearing on either permit. The sole stated basis for the NJDEP's denial of the request was that this Court's decision in Delaware I established that we have "exclusive jurisdiction to review the issuance of permits regarding interstate natural gas pipeline projects" and accordingly that by operation of the NGA "the state administrative hearing process provided for in the [FWPA] is not applicable to permits for interstate natural gas projects." NJDEP App. 39. Concluding that the NGA

11

"requires that final permits be appealed to the Third Circuit," the NJDEP denied the petitioners' hearing requests.

The petitioners timely sought review in this Court, both of FERC's orders issuing the certificate and denying rehearing, and of the NJDEP's issuance of the permits and its order denying the requests for an adjudicatory hearing to challenge them. We have jurisdiction to review these petitions for review of the federal and state agencies' orders regarding the interstate Project under 15 U.S.C. § 717r(d)(1).

## III.  Challenges to FERC's Orders

We begin with the challenges directed at FERC's orders (docket No. 17-1047). As explained more fully below, we conclude that the petitioners' FERC-related claims are unavailing.

## A.  Interpreting the CWA

Before turning to the merits of the certificate's issuance, we must address the petitioners' challenge to its timing. As noted, Transco was required under the CWA to obtain a Section 401 permit from the NJDEP affirming that Transco's discharge activities would comply with federal and state water quality standards. Under Section 401, Transco had to obtain such a permit prior to the issuance of any "Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters." 33 U.S.C. § 1341(a); see also id. ("No license or permit shall be granted until the certification required by this section has been obtained or has been waived . . . ."). The petitioners argue that, despite this clear language, FERC issued the certificate to Transco before

12

Transco obtained the Section 401 permit from New Jersey, thereby authorizing the pipeline project that "may result in . . . discharge into the navigable waters" in contravention of § 1341(a)'s mandate.

FERC does not dispute that Transco had yet to obtain the Section 401 permit, but argues instead that it only issued a conditional certificate, which required Transco first to obtain the required state permits and then to secure FERC's permission to proceed before it could begin any construction related to the project. See App. 67, 89–90. In FERC's view, because the certificate did not, in fact, permit Transco to "conduct any activity" that could "result in any discharge into the navigable waters" until Transco had received the necessary state permits, FERC's issuance of the conditional certificate prior to Transco's receipt of the state-issued Section 401 permit did not contravene the CWA.[4] We agree with FERC's position and hold that FERC's practice of issuing certificates that condition the start of construction on the receipt of the necessary state permits complies with the plain language of the CWA.[5]

---

[4] We note that it is not FERC, but the Environmental Protection Agency, that is tasked with administering the CWA, so FERC's views are not entitled to deference. See, e.g., Scafar Contracting, Inc. v. Sec'y of Labor, 325 F.3d 422, 423 (3d Cir. 2003).

[5] In so holding, we agree with the reasoning of the Court of Appeals for the District of Columbia Circuit in Del. Riverkeeper Network v. FERC, 857 F.3d 388 (D.C. Cir. 2017).

13

As the Court of Appeals for the District of Columbia Circuit explained, "the 'logically antecedent' question under § 401 is whether the disputed federal permit or license 'is subject to the provisions of Section 401(a)(1)' in the first place." Del. Riverkeeper Network v. FERC, 857 F.3d 388, 398 (D.C. Cir. 2017) ("DRN II") (quoting North Carolina v. FERC, 112 F.3d 1175, 1186 (D.C. Cir. 1997)). Where the conduct that the certificate authorizes "would not result in a discharge," Section 401(a) is inapposite and no "license or permit" is needed to engage in that conduct. Id.

The petitioners concede that the certificate did not permit Transco to engage in any construction — which implicitly acknowledges that it did not permit Transco to engage in any activity that could result in discharge — but argue that the certificate nevertheless "sanctions other conduct that Transco would not otherwise be permitted to undertake," such as initiating condemnation actions under the NGA, 15 U.S.C. § 717f(h). Pet. Br. 35. However, the activity that FERC's certificate allows to commence — bringing a condemnation action — cannot, without a series of additional steps (among them the prohibited construction activities), result in the discharge of water.[6] Even accepting the

_____

[6] The petitioners reply that nothing in the CWA "limit[s] the scope of covered permits to those [actions] that directly or immediately may result in a discharge" and that under the plain definition of "result" — meaning "a physical, logical, or legal consequence" — the certificate "which authorizes Transco's pipeline, may 'result' in a discharge." Reply 13–14 (quoting Black's Law Dictionary (10th ed. 2014)). But given the express condition that Transco obtain all the required state

14

petitioners' argument, FERC's conditional certification does not contravene the CWA's requirements. The petitioners' argument would expand the CWA from a statute meant to safeguard the nation's water sources to a statute regulating the initiation of an interstate pipeline's construction process. However, the latter statute already exists and, as the petitioners themselves note, it provides Transco the condemnation authority upon the issuance of the certificate, with no caveats. To the extent that the NGA recognizes the continued applicability of the CWA, it is only with respect to pipeline-related activities that impact the CWA's area of concern. The mere ability to initiate condemnation proceedings, proceedings regarding land from which discharge

---

permits before obtaining authorization to begin construction — which the petitioners do not contest is the only conduct that could proximately result in discharge — the certificate alone neither "logically" nor "legally" results in the consequence of a discharge. It is black letter law that an independent intervening act — here, the state permit and FERC's authorization to commence construction — severs the causal chain. See, e.g., Texas v. United States, 809 F.3d 134, 160 (5th Cir. 2015) (explaining that "the Supreme Court [has] held that an injury [is] not fairly traceable" to an action where the "independent act of a third party was a necessary condition of the harm's occurrence, and it was uncertain whether the third party would take the required step"), aff'd by an equally divided court, 136 S. Ct. 2271 (2016). In summary, because no discharge-creating activity can commence without New Jersey independently awarding Transco with a Section 401 permit, no activities that may result in a discharge can follow as a logical result of just FERC's issuance of the certificate.

15

into the United States' navigable waters might not even occur, plainly is not an activity that the CWA prohibits prior to obtaining a Section 401 permit.

Because, as was the case before the D.C. Circuit, the petitioners have "pointed to no activities authorized by the conditional certificate itself that may result in such discharge prior to the state approval and the Commission's issuance of a Notice to Proceed," DRN II, 857 F.3d at 399 (quoting Gunpowder Riverkeeper v. FERC, 807 F.3d 267, 279 (D.C. Cir. 2015) (Rogers, J., dissenting in part and concurring in the judgment)), we conclude that FERC did not violate the CWA by issuing the certificate prior to the NJDEP's issuance of its Section 401 permit.

## B.  NEPA Challenges

Turning to the merits of FERC's issuance of the certificate, the petitioners first raise a number claims asserting that FERC violated NEPA by failing — in numerous ways — to consider the full scope of the Project's environmental impacts.  The petitioners specifically challenge FERC's conclusion that the Project's impacts should be considered separately from the impacts of the PennEast and SRL projects, as well as FERC's determination that the Project would not significantly impact the potable wells in the project's vicinity.

NEPA is "primarily [an] information-forcing" statute; it "directs agencies only to look hard at the environmental effects of their decisions, and not to take one type of action or another." Sierra Club v. FERC, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (quoting Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 194 (D.C. Cir. 1991)).  In addition to that general

16

directive, NEPA created the Council of Environmental Quality ("CEQ") to issue regulations to effectuate the statute. These regulations are "'mandatory' for all federal agencies, carry the force of law, and are entitled to 'substantial deference.'" Del. Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of Eng'rs, 685 F.3d 259, 269 (3d Cir. 2012) (quoting Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 372 (1989)). A court reviewing an agency decision under NEPA and its implementing regulations may only overturn an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Del. Dep't of Nat. Res., 685 F.3d at 271. So long as the agency takes a "'hard look' at the environmental consequences" the agency has satisfied its responsibilities and a reviewing court may not "substitute its judgment for that of the agency as to the environmental consequences of its actions." Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976) (quoting NRDC v. Morton, 458 F.2d 827, 838 (D.C. Cir. 1972)). In other words, NEPA "requires informed decisionmaking 'but not necessarily the best decision.'" WildEarth Guardians v. Jewell, 738 F.3d 298, 303 (D.C. Cir. 2013) (quoting New York v. Nuclear Regulatory Comm'n, 681 F.3d 471, 476 (D.C. Cir. 2012)).

### 1. Segmentation of PennEast

Under NEPA and its implementing regulations, when evaluating a proposed project's environmental impacts, an agency must take account of "connected," "cumulative," and "similar actions" whose impacts should be "discussed in the same impact statement" as the project under review. 40 C.F.R. § 1508.25(a). Where an agency instead attempts to consider such related actions separately by segmenting the mandated

17

unified review into multiple independent analyses that insulate each project from the impacts created by its sister projects, it "fails to address the true scope and impact of the activities that should be under consideration" and therefore runs afoul of NEPA. Del. Riverkeeper Network v. FERC, 753 F.3d 1304, 1313 (D.C. Cir. 2014) ("DRN I"). The petitioners allege that FERC did just that, by refusing to consider the Project's impacts in conjunction with the anticipated impacts of the proposed PennEast pipeline that, when completed, will be the source of the gas that NJNG will transport using the capacity added by the Project. The petitioners insist that PennEast is a "connected action" that must be considered together with the Project because the two pipeline projects "lack independent functional utility." Pet. Br. 16 (citing Native Ecosystems Council v. Dombeck, 304 F.3d 886, 894–95 (9th Cir. 2002)). Given that the undisputed facts here clearly attest to the projects' separateness, we conclude that FERC correctly rejected this argument.

Actions are deemed "connected" with one another if they "(i) [a]utomatically trigger other actions which may require environmental impact statements," "(ii) [c]annot or will not proceed unless other actions are taken previously or simultaneously," or "(iii) [a]re interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1). The petitioners' claim relies on the third basis for finding a connected action. In line with the prevailing view amongst the Courts of Appeals, both FERC and the petitioners agree that the essential question is whether the segmented projects have independent utility. See Pet. Br. 16; App. 45; see also, e.g., Coal. on W. Valley Nuclear Wastes v. Chu, 592 F.3d 306, 312 (2d Cir. 2009) ("The proper test to determine relatedness under 40 C.F.R. §

18

1508.25(a)(1)(iii) is whether the project has independent utility." (quoting Town of Huntington v. Marsh, 859 F.2d 1134, 1142 (2d Cir. 1988))); Great Basin Mine Watch v. Hankins, 456 F.3d 955, 969 (9th Cir. 2006) (same). Projects have independent utility where "each project would have taken place in the other's absence." Webster v. U.S. Dep't of Agric., 685 F.3d 411, 426 (4th Cir. 2012) (collecting cases).

The petitioners' theory of interdependence — or, stated in the inverse, the lack of independent utility — relies entirely on their unfounded contention that "Transco's sole stated purpose for the Project is to supply capacity to NJNG from the PennEast Line." Pet. Br. 16. But this is simply not so. The statements that the petitioners point to in support merely articulate the undisputed fact that the Project would supply capacity to NJNG; they are agnostic as to the source of the gas that would utilize the capacity. App. 887, 1419.[7] Rather, as FERC concluded below, the agreement between NJNG and Transco concerning the Project makes clear both that NJNG contracted for Transco's capacity without regard to the source (or even availability) of the natural gas — which NJNG is alone responsible for sourcing — and, more importantly, that the actual source of the physical supply for the capacity added by the Project is the Station 210 Zone 6 pooling point, not the

---

[7] Notably, only a few pages later in their brief, the petitioners again cite to page 887 of the appendix, but this time assert that the Project's "sole purpose was to connect one of [Transco's] existing pipelines to a new intrastate SRL pipeline to be constructed by NJNG." Pet. Br. 22. It goes without saying that the "sole purpose" of the pipeline cannot be both to connect to PennEast and to connect to the Transco Mainline.

19

PennEast line.[8]  In addition, FERC found the PennEast project's proposed capacity of 1,107,000 dekatherms per day is 90 percent subscribed by 12 different shippers, such that NJNG's subscription makes up less than 15 percent of the pipeline's capacity.  App. 47–50; 80.  In other words, the Project would go forward even if PennEast were not built (such that NJNG could not obtain PennEast gas to consume Transco's capacity) and conversely the PennEast project would go forward even if the Project were not built (such that PennEast could not deliver its gas to NJNG).

Indeed, in their reply, the petitioners all but concede that their segmentation claim fails.  They acknowledge that PennEast has independent utility from the Project because it serves many shippers apart from NJNG.  Reply Br. 7.  They further concede that, even if PennEast is not built, NJNG could use the extra capacity provided by the Project to transport gas purchased from another supplier and moreover that NJNG's contract with Transco obligates it "to obtain the gas regardless of whether the Penn East project is built."  Reply Br. 7.  The petitioners' continued argument that FERC improperly segmented the Project and PennEast thus relies on the petitioners' bare assertion that this contractual setup — which establishes that NJNG must use the Project's increased capacity whether or not the gas comes from the PennEast line — is entirely irrelevant to determining whether the sole

---

[8] The Zone 6 pooling point is located north of Station 205 (where the gas would divert down Transco's Trenton-Woodbury lateral for delivery to NJNG at Station 203), which is itself located north of the point where PennEast is set to connect to the Transco Mainline.

20

purpose of the Project is to connect PennEast and the SRL.  But even to describe the petitioners' argument is to refute it.  If just constructing the Project — and thus adding the capacity that NJNG requires — is sufficient to meet Transco's contractual obligation, such that NJNG must buy the capacity regardless of any other contingency (such as PennEast's status), then the Project's construction alone plainly serves an independent purpose separate and apart from whatever happens to the PennEast pipeline.[9]    See, e.g., NRDC v. U.S. Nuclear

---

[9] Because NJNG's contract with Transco makes no mention of PennEast, the petitioners' reliance on the Court of Appeals for the District of Columbia Circuit's rejection of an argument similar to the one FERC advances here in inapposite.  In DRN I, the court accepted that proof of a project's "commercial and financial viability . . . when considered in isolation" from the other projects that were allegedly being segmented was "potentially an important consideration in determining whether the substantial independent utility factor has been met," but concluded that the "shipping contracts in this case" were insufficient because the contracts themselves tended to show that the projects were in fact "interdependent."  753 F.3d at 1316 (emphasis added).  Specifically, the court noted that the contract at issue calculated its rates by taking into account the costs and capacities of the other projects and had a provision explicitly allowing for a rate adjustment in the event of a the construction of one of the improperly segmented projects.  Id. at 1317.  These provisions highlighted the interconnectedness of the projects.  Here, by contrast, Transco and NJNG's contract makes no mention of PennEast, the negotiated rate does not depend on the source of the gas, and the contract clearly

Regulatory Comm'n, 879 F.3d 1202, 1209 (D.C. Cir. 2018) (rejecting as insufficient to rebut a finding of economic viability a petitioner's claim that the developer had "envisioned" the project "as part of a larger" development plan).

To conclude otherwise, the petitioners confuse the means of the Project for its ends. The Project exists to fulfill NJNG's need for gas in southern New Jersey, a need that will exist and require satisfaction whether or not PennEast is constructed. As we elaborate on below in discussing the need for the Project, NJNG required more supply to shore-up the southern parts of the state after Hurricane Sandy. App. 1419. To obtain that supply, NJNG contracted (1) with Transco to increase its pipeline's capacity and (2) with PennEast to get the gas to Transco. But while Transco's capacity increase is necessary to the plan, PennEast's participation is not. NJNG can (and by contract, must) simply buy gas from the Zone 6 pooling point that was delivered by a different supplier.

Finally, even if the petitioners are correct that we are obligated to ignore the contractual terms and focus only on the functionality of the pipeline, such an analysis points

establishes that NJNG is solely responsible for acquiring the gas supply. Unlike in Delaware Riverkeeper, then, the Project is financially independent of PennEast, because it will be paid for and utilized regardless of PennEast's existence. Under Delaware Riverkeeper's own framework, this evidence is an "important consideration" in the independent utility analysis. Id. at 1316.

22

conclusively in FERC's favor. Transco's Mainline can change the direction of gas flow depending on market conditions. See App. 49–501. The Station 210 Zone 6 Pooling point (connecting Transco's Leidy line to the Mainline) thus can either send gas from the Leidy line to the South or pull flow from the Gulf of Mexico northward, depending on market factors — such as where the cheaper gas is being produced. App. 49. The PennEast pipeline will connect to the Transco Mainline south of the Station 210 Zone 6 pool from which NJNG has contracted with Transco to obtain the supply created by the project. Accordingly, the Zone 6 pool will only be filled with gas physically brought in by the PennEast line during times when the Mainline is running South-to-North. The mechanics of the Transco Mainline's flow — determined without consideration of the NJNG contract — make it highly unlikely that the physical gas flowing from the Zone 6 pool, through the Transco lateral, to the SRL will only be gas piped in by PennEast. In a pipeline, gas is fungible, so "its 'transportation' does not always take the form of the physical carriage of a particular supply of gas from its starting point to its destination." Associated Gas Distribs. v. FERC, 899 F.2d 1250, 1254 n.1 (D.C. Cir. 1990). NJNG's contract to purchase gas from PennEast and its simultaneous contract with Transco for capacity to transport that exact amount of gas was not, as the petitioners argue to this Court, a contract to purchase and transport PennEast's physical gas to the SRL. It was rather a contract to purchase an amount of gas from PennEast for inclusion in the Transco system, supported by a separate contract between NJNG and Transco to transport that same amount of gas from Transco's pooling station to the SRL. As FERC explained in its order denying rehearing, although "it is feasible, using backhaul and other methods, that natural gas from the PennEast Project could ultimately be delivered on

23

Transco to reach the" SRL, that is not the way that the Mainline will necessarily operate. App. 81 n.36. The Project will thus often service the SRL with non-PennEast-derived natural gas, cementing our conclusion that the Project has a value independent of the PennEast line.[10]

Because we conclude that the Project's purpose is to supply the capacity that NJNG requested from their Zone 6 pool, and that the source of the pool's gas will be determined based on market conditions, we agree that FERC's refusal to consider PennEast a "connected action" in the Project's EA was not arbitrary and capricious.

## 2. Consideration of the SRL

### a. Direct Review

As an intrastate pipeline, the SRL does not fall within FERC's jurisdiction under the NGA. Nevertheless, in

---

[10] On this point, it is noteworthy that as of the time this case was submitted, the Project had been completed and placed into service, see FERC Docket CP15-89, Submittal 20180329-5212 (Mar. 29, 2018), whereas the PennEast pipeline had only just been approved by FERC, see PennEast Pipeline Co., 162 FERC ¶ 61,053 (2018). See generally, e.g., Town of Norwood v. New Eng. Power Co., 202 F.3d 408, 412 (1st Cir. 2000) (holding that courts may take judicial notice of "the underlying FERC proceedings"). That the Project is operational and transporting gas even though PennEast has not yet even begun construction shows conclusively that the Project is not reliant on PennEast's existence.

recognition of the fact that in some cases FERC "is required under NEPA to give some environmental consideration of nonjurisdictional facilities," FERC has developed a four-factor balancing test "to determine whether there is sufficient federal control over a project to warrant environmental analysis." Nat'l Comm. for the New River v. FERC, 373 F.3d 1323, 1333 (D.C. Cir. 2004). Under the test, FERC considers

> (1) whether the regulated activity comprises "merely a link" in a corridor type project; (2) whether there are aspects of the non-jurisdictional facility in the immediate vicinity of the regulated activity that uniquely determine the location and configuration of the regulated activity; (3) the extent to which the entire project will be within the Commission's jurisdiction; and (4) the extent of cumulative federal control and responsibility.

Id. at 1333–34 (citing 18 C.F.R. § 380.12(c)(2)(ii)). As the Court of Appeals for the District of Columbia Circuit has explained, the purpose of this test is to limit consideration of the environmental impacts of non-jurisdictional facilities to cases in which those facilities "are built in conjunction with jurisdictional facilities and are an essential part of a major federal action having a significant effect on the environment." Id. at 1334.

Applying the test in its order denying the petitioners' request for rehearing, FERC concluded that "on balance" the factors weighed against federalizing the SRL. App. 83. It reached this conclusion after giving careful attention to each factor. As to the first factor, for the same reasons that PennEast

25

and the Project were not improperly segmented, FERC concluded that PennEast, the SRL, and the Project do not comprise a single corridor type project and that the Project would be a comparatively minor element compared to the 30-mile SRL. On the second factor, FERC concluded that the SRL did not "uniquely determine" the location of the project, because the SRL needed only to connect to the Transco lateral at some point at or downstream of the newly constructed Station 203, not to the compressor station itself. The location of Station 203, accordingly, was not uniquely dictated by the needs of the SRL. Regarding the third factor, FERC explained that (excluding PennEast which, as noted, is not part of the Project) the jurisdictional Project is dwarfed by the size of the SRL. FERC rejected the contention that its oversight of the PennEast's and the Project's costs — which the petitioners assert will be passed on to SRL ratepayers — means that FERC has decisional authority impacting the SRL. As FERC further explained, because each pipeline is owned by different companies, there will be no cost sharing between them; rather, shippers using each line will bear their own costs. Moreover, the tariffs of SRL, as an intrastate line, are governed by the New Jersey Board of Public Utilities and FERC has no role in funding, approving, or overseeing the SRL's construction or operation. Finally, concerning the fourth factor, FERC noted the almost total absence of federal control over the SRL and rejected the petitioners' argument that, by briefly traversing a federal military base and in light of some generally applicable federal permitting requirements, the SRL was subject to significant cumulative federal control. Although we recognize that one could quibble with its analysis of the second factor, we discern no abuse of discretion in FERC's final analysis or its weighing of the factors.

The petitioners' argument that the first factor is satisfied is based solely on their view that the Project, when considered in conjunction with the 122-mile PennEast line, is significantly larger than the SRL. But this avenue of attack is foreclosed by our agreement with FERC's determination that the PennEast line was properly segmented from the Project. The petitioners' assertion that FERC has de facto jurisdiction over the SRL by virtue of its oversight over the Project's rates which in turn impacts the SRL's rates, even if accurate, articulates a logic that would extend FERC oversight over every non-jurisdictional project that attaches to an interstate pipeline. Such a rule would swallow the non-jurisdictional exception altogether. By its nature, a pipeline network consists of interstate and intrastate projects, and so the projects' connectedness alone — along with inherent cross-effects created by that connection — cannot weigh meaningfully in favor of federal control over purely intrastate projects. See New River, 373 F.3d at 1334 (repudiating view that would require "the Commission to extend its jurisdiction over non-jurisdictional activities simply on the basis that they were connected to a jurisdictional pipeline"). Finally, that the SRL (1) would need to obtain an easement from the federal government, (2) traverses a federally designated National Reserve (managed by a state agency), and (3) must abide by generally applicable pipeline safety regulations are slim reeds upon which to assert cumulative federal control over the entire SRL. See, e.g., Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 195 (4th Cir. 2009) (explaining that the fact that a federal permit must be secured prior to commencing — and "is central to the success" of — a project, "does not itself give the [permitting agency] 'control and responsibility' over the entire" project); New River, 373 F.3d at 1334 (deferring to FERC's determination of insufficient control despite

27

petitioner's argument that the project at issue was subject to numerous federal licensing requirements).  Because the above three factors weigh clearly against asserting federal jurisdiction over the SRL, the possibility that the location of Station 203 — which links up to the SRL — was dictated in part by the location of the SRL does not render FERC's ultimate balancing arbitrary and capricious.  The record evidence falls short of showing that the location was "uniquely determine[d]" by the SRL, but even if it did, this factor alone would not change the reasonableness of FERC's balancing, to which we accordingly defer.  See New River, 373 F.3d at 1334 (rejecting petitioner's claim that satisfying the second factor, alone, is sufficient "to tip the balance in the four-factor test").

### b.  Cumulative Impacts

The petitioners alternatively argue that, even if FERC were not required to assert jurisdiction over the SRL, it was nevertheless required under NEPA to assess whether — in conjunction with the jurisdictional Project — the non-jurisdictional SRL would foreseeably have cumulative impacts on the environment.  Under NEPA's implementing regulations, FERC is required to consider "the incremental [environmental] impact" of the jurisdictional action when added to the existing or "reasonably foreseeable" impacts of other actions, whether or not jurisdictional.  40 C.F.R. §§ 1508.7, .25; see also id. § 1508.7 ("Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.").  When conducting a cumulative-impacts analysis, FERC:

> [M]ust identify (i) the 'area in which the effects of the proposed project will be felt'; (ii) the

28

impact expected 'in that area'; (iii) those 'other actions — past, present, and proposed, and reasonably foreseeable' that have had or will have impact 'in the same area'; (iv) the effects of those other impacts; and ([v]) the 'overall impact that can be expected if the individual impacts are allowed to accumulate.'

Sierra Club v. FERC, 827 F.3d 36, 49 (D.C. Cir. 2016) (quotation marks omitted) (quoting TOMAC v. Norton, 433 F.3d 852, 864 (D.C. Cir. 2006)).

In line with this test, FERC determined that the Project's "main region of influence" in which cumulative impacts might be felt was .25 miles from each of the Project's components, but nevertheless considered the cumulative impacts of the SRL, PennEast line, and other projects even though they largely fell outside of the Project's area of influence. FERC recognized that both the Project and the SRL would impact wetlands, but concluded based on the Project's limited geographic and durational impact, along with FERC's mandated mitigation measures, that any cumulative effects would be minor. It reached similar conclusions regarding impacts to vegetation and wildlife, explaining that cumulative effects are greatest when projects are built in the same geography, during the same time period, and where the impacts are expected to be long-term. FERC noted that the SRL, although largely occurring within existing rights of way, would be a significant pipeline project situated in a variety of habitats, including the protected Pinelands Area, and would be subject to extensive state-level regulation that would determine its ultimate environmental impacts. FERC accordingly outlined the potential area and kinds of resources that the SRL could

29

impact but — in recognition of the ongoing state regulation — did not firmly conclude how the impacts would manifest. Nonetheless, it determined that the Project's largely short-term effects on vegetation and wildlife would not result in cumulative long-term impacts, even when added to the SRL's potentially greater impacts, which would in any event be controlled by state regulators. FERC similarly concluded that the Project's contribution to cumulative impacts on land use would minimal, given that only a small portion of the land permanently impacted by the Project would be forested, compared to the varied and more expansive terrain impacted by the miles-long SRL. Based on its finding that "each project would be designed to avoid or minimize impacts on water quality, forest, and wildlife resources," and given the Project's expected "temporary and minor effects," FERC concluded that the Project "would not result in cumulative impacts." App. 1465, 1474.

The petitioners complaint is not that the .25 mile area was incorrect,[11] but that FERC failed to take full account of all the environmental impacts across the entire span of pipelines other than the project under review — impacts far afield from the geographic area impacted by the Project — merely because those pipelines will ultimately be part of the same network as that served by the Project. To echo the Court of Appeals for the District of Columbia Circuit, such an expansive reading of

---

[11] Rightly so, given that the "determination of the size and location of the relevant geographic area 'requires a high level of technical expertise,' and thus 'is a task assigned to the special competency of' the Commission." Sierra Club, 827 F.3d at 49 (quoting Kleppe, 427 U.S. at 412).

30

the cumulative impacts requirement "draws the NEPA circle too wide for the Commission," which need only review impacts likely to occur in the area affected by the project under FERC review. Sierra Club, 827 F.3d at 50. In this case, notwithstanding its determination — uncontested on appeal — that the area impacted by the Project was of an exceptionally small size, FERC considered the cumulative impact of the totality of the SRL (and PennEast) pipeline and determined that their cumulative impact was insignificant. In light of the gratuitousness of FERC's extended cumulative impacts review, the petitioners' complaint — which concedes the sufficiency of FERC's analysis as it relates to wetlands — that FERC gave short-shrift to its consideration of the SRL's impact on vegetation, wildlife, and aquatic species fails to persuade us.

The core of the petitioners' argument, that the SRL "as a major linear project" that will span "approximately 30 miles in length" will result in "considerable" environmental impacts along its path, Pet. Br. 20, itself defeats their claim that FERC had to consider all those various and oblique impacts when determining whether the SRL would cumulatively impact "the same area" as the project before it — involving no new pipeline construction and disturbing only the immediately surrounding area. Accordingly, FERC did not act arbitrarily or capriciously when it "acknowledge[d] that these resources may be affected" by the SRL but properly determined that "a detailed analysis" of the impacts along the entirety of the SRL was "not within the scope of our environmental analysis" for the jurisdictional Project under review. App. 53. By detailing and recognizing even environmental impacts outside of the zone impacted by the jurisdictional Project, FERC gave the petitioners' concerns the "serious consideration and reasonable responses" that

31

NEPA requires.  Tinicum Twp. v. U.S. Dep't of Transp., 685 F.3d 288, 298 (3d Cir. 2012).  NEPA does not mandate exhaustive treatment of effects not plausibly felt in the Project's impact area.

But even taken head-on, the petitioners' argument is unavailing.  Contrary to the petitioners' claim, FERC did consider the SRL's impact on vegetation and wildlife, and given the Project's "minor . . . impacts" determined that the cumulative impacts would be insignificant.  App. 1469.  FERC explicitly acknowledged that the SRL may affect the Pinelands National Reserve and concluded reasonably that any impacts would be mitigated by the responsible state agency overseeing the permitting process for that project.  App. 53.  FERC was correct to rely upon New Jersey authorities to do so, as opposed — as the petitioners would have it — to assuming the worst and piggybacking that hypothetical impact onto the otherwise compliant jurisdictional Project.[12]  See, e.g., EarthReports, Inc.

---

[12] The determination of whether a cumulative impacts analysis is required in the first place depends on a consideration of "the likelihood that a given project will be constructed"; "[t]he more certain it is that a given project will be completed, the more reasonable it is to require a[n] . . . applicant to consider the cumulative impact of that project."  Soc'y Hill Towers Owners' Ass'n v. Rendell, 210 F.3d 168, 182 (3d Cir. 2000); see also id. at 181 ("[T]he concept of 'cumulative impact' was not intended to expand an inquiry into the realm of the fanciful.").  Here, the petitioners try to have it both ways.  In arguing that FERC improperly determined that there was a public need for the Project, the petitioners accuse FERC of accepting Transco's "speculative" assertion of need given that

v. FERC, 828 F.3d 949, 959 (D.C. Cir. 2016) (concluding that FERC reasonably relied upon the regulated parties' "future coordination with" other regulators in its NEPA assessment); Ohio Valley, 556 F.3d at 207–08 (upholding finding of no cumulative impact that was based partly on projected mitigation efforts because the mitigation was a condition of other permitting regimes to which the project was subject and thus was not speculative or conclusory); Friends of Ompompanoosuc v. FERC, 968 F.2d 1549, 1555 (2d Cir. 1992) (concluding that regulated parties' responsibility to work with local authorities on mitigation proposal constituted a "rational basis" for FERC finding of no significant impact). Again, NEPA requires no more than the fair

---

"there is a very real possibility that . . . the SRL will [not] go forward." Pet. Br. 22. Nevertheless, the petitioners simultaneously demand that FERC consider the worst-case scenario of environmental impacts from the SRL as part of its approval of the Project, without accounting for the state-mandated mitigation that would necessarily attach to any approved plan. But obviously, if the SRL's construction is at this point so speculative that it cannot be the basis of Transco's proof of public need, then FERC need not consider the hypothetical cumulative impacts of that speculative project. Especially where, as here, we have concluded that FERC was correct to segment the Project and the SRL, our precedent demands that it be "sufficiently certain that [the] other projects will be constructed" before an agency is required to include a cumulative impact analysis in its EA. Id. at 182. The petitioners' explicit contention that this certainty is lacking is itself a reason to reject their complaints about the sufficiency of FERC's cumulative impacts analysis.

consideration and reasonable responses that FERC provided to the petitioners' concerns.

Furthermore, had FERC failed to give the specific attention that it did to the various types of impacts that the SRL might potentially cause, we would still approve their cumulative impact conclusions. Aside from their challenge to FERC's determination of the Project's well impacts (discussed below), the petitioners do not contend that FERC improperly concluded that, taken alone, the Project would not "significantly affect[] the quality of the human environment." App. 64; see also App. 1424 (concluding in the EA that "the impacts associated with th[e] Project can be sufficiently mitigated to support a finding of no significant impact"). And — again, besides the wells challenge — nothing in the petitioners' briefing suggests that FERC's detailed consideration of the Project's impacts to the area's geology; water resources; vegetation; wildlife; endangered species; cultural resources; land use, recreation, and visual resources; or air quality and noise was erroneous or wanting. FERC thus reasonably concluded in the EA that the Project's "minimal impacts" in its service area — relegated largely to "geological and soil resources" impacts and other temporary impacts — meant that the Project necessarily "would not result in cumulative impacts." App. 1465, 1469. We conclude that FERC did not abuse its discretion in reaching this decision. This is especially true considering that the impacts from the SRL that the petitioners allege FERC ignored are different than the limited kind of impacts that FERC concluded were likely to result from the Project and so are less likely to result in cumulatively significant impacts when

considered together.[13] See Council of Envtl. Quality, Considering Cumulative Effects Under the National Environmental Policy Act 8 (Jan. 1997) ("Cumulative effects need to be analyzed in terms of the specific resource . . . being affected."). Given that the petitioners failed to show anything more than minimal impacts from the Project itself, they have failed to show that FERC acted arbitrarily or capriciously in determining that the Project would likewise not contribute to significant cumulative impacts, even taking into account the potential different impacts of the SRL on other areas within the Project's region. This conclusion is reinforced by the petitioners' own insistence that the SRL's construction is being held up by legal challenges, Pet. Br. 22–24, such that whatever impacts it causes will be temporally distinct from the Project's short-term impacts. See, e.g., Friends of Santa Clara River v. U.S. Army Corps of Eng'rs, 887 F.3d 906, 926 (9th Cir. 2018) (concluding that where an EIS reasonably finds that a project is unlikely to have an impact on a given population, that it is "also not arbitrary or capricious to conclude that the Project would not result in significant cumulative . . . impacts" to that

---

[13] For instance, the petitioners argue that FERC failed to consider the "cumulative impacts on . . . aquatic species" associated with the construction of the Project and the SRL. Pet. Br. 21. But the EA is clear that the Project "would not impact any waterways." App. 1445; see also App. 58 (reiterating that restrictions aimed at protecting certain fish species were inapplicable because "no surface waters will be affected by project activities"). Obviously, to the extent that the Project is expected to have no impact on aquatic species, it cannot incrementally impact whatever aquatic species are impacted by the SRL.

population); Minisink Residents for Envtl. Pres. & Safety v. FERC, 762 F.3d 97, 113 (D.C. Cir. 2014) (upholding cumulative impact analysis finding "no significant cumulative impacts were expected" where the project under consideration "itself was expected to have minimal impacts" and — as is the case here — the two projects had distinct construction timelines). By addressing and expressly considering the specific concerns raised by the petitioners, FERC "fulfilled NEPA's goal of guiding informed decisionmaking" and ensured that FERC at least considered the wisdom of the agency action. Sierra Club, 867 F.3d at 1370–71; Sierra Club v. U.S. Dep't of Energy, 867 F.3d 189, 196 (D.C. Cir. 2017) ("Our job is simply 'to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" (quoting DRN I, 753 F.3d at 1312–13)).

The petitioners nevertheless argue that this low-impact project should be halted as a result of the possibly significant — but mostly different-in-kind — impacts of the nearby but later-in-time SRL. But this cannot be how the cumulative analysis inquiry operates. To hold otherwise would permit a jurisdictional project with little environmental impact to be torpedoed based only on a nearby non-jurisdictional project's significant impact, which FERC has no authority to control or mitigate. Such a rule would effectively condition the approval of pipelines operating under federal jurisdiction on the fastidiousness of pipeline companies operating in the same region under state authorities. Pipelines subject to lax state authorities or state environmental requirements that fall short of federal standards could, by mere proximity to a jurisdictional project, trump federal regulation and undermine FERC's careful balancing of environmental protection and

36

public energy needs. Less pernicious, if a proposed state-governed project has potentially significant impacts but has not yet gone through the state's regulatory process (which could be expected to mitigate those impacts), such a project would essentially stay all federally regulated projects proposed in the area until the state agency either rejects the plan or approves a mitigation proposal. Congress surely did not intend for FERC's exclusive authority to control interstate pipeline construction to be so easily usurped by state regulators. Rather, the cumulative impacts analysis was meant to address instances where the jurisdictional project itself has minor environmental impacts that nevertheless fall short of stopping the project, but where — if added to the minor impacts from nearby non-jurisdictional projects — the cumulative impact of all the projects would be significant. See 40 C.F.R. § 1508.7 ("Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."); cf. id. § 1508.27 (setting out considerations for whether a project is "significant," including whether it "is related to other actions with individually insignificant but cumulatively significant impacts" (emphasis added)). The analysis was not intended to combine the effects of a nearly no-impact project with those of a project with potentially serious impacts and then to bar them both.

The relevant question — as FERC correctly understood — is rather whether, taking the non-jurisdictional impacts as a given, the addition of the jurisdictional project's impacts on top of the other projects' existing or anticipated impacts renders significant those projects' otherwise insignificant impacts. See 40 C.F.R. § 1508.7 ("Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably

37

foreseeable actions . . . ." (emphasis added)); Cascadia Wildlands v. Bureau of Indian Affairs, 801 F.3d 1105, 1112 (9th Cir. 2015) ("An agency can take a 'hard look' at cumulative impacts . . . by . . . incorporating the expected impact of [a forthcoming] project into the environmental baseline against which the incremental impact of a proposed project is measured."); see also App. 1471 ("Only a small portion of forested land use would be impacted by the operation of the [Project]. These impacts would not contribute significantly to the cumulative impacts of the other projects in the region. Since the . . . [SRL] include[s] a linear pipeline, [it] would result in greater temporary and permanent impacts in acreage and affect a variety of land uses."). In other words, the analysis looks at the marginal impact of the jurisdictional project when added to the non-jurisdictional projects' impacts, and asks whether the addition of the project under review affects a meaningful increase in the projected environmental impacts. See, e.g., Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 994 (9th Cir. 2004); Landmark West! v. U.S. Postal Serv., 840 F. Supp. 994, 1011 (S.D.N.Y. 1993), aff'd, 41 F.3d 1500 (2d Cir. 1994) (explaining that the cumulative impacts analysis requires "the consideration of the foreseeable actions of others as background factors, but does not require that the impacts of others' actions be weighed in assessing the significance of [the] action[ under review]. Rather, the [agency] need weigh only the marginal impacts of its own actions."). Where the other projects' impacts are themselves already significant or greatly outweigh the jurisdictional projects' impacts, such that the jurisdictional project will not meaningfully influence the extent of the already significant environmental impacts, the cumulative impacts test is inapposite. Were this not so, a single proposed project with a significant projected impact would preempt any

other development — even no-impact or impact-reducing projects — regardless of whether the proposed project ultimately will come to fruition or have those expected impacts. Plainly, such an application of the cumulative impacts analysis is unreasonable and unwarranted, and we reject it. We conclude that FERC adequately addressed the Project's cumulative impacts.

### 3. Potable Well Impacts

The petitioners' final NEPA-based claim regards FERC's conclusion that the Project's construction would not significantly impact the water quality of wells or cisterns in the service area. In its EA, FERC determined that "[m]inor, temporary impacts on groundwater infiltration could occur as a result of tree, herbaceous vegetation, or scrub-shrub vegetation clearing" around Station 203 during its construction, but that Transco would thereafter "restore and revegetate cleared areas to pre-construction conditions to the maximum extent practicable." App. 17–18. The EA continued that, in the event that groundwater is "encountered during construction," Transco would adhere to a series of mitigation measures, which would ensure that "impacts on groundwater would be adequately minimized." App. 18. Although reaching this general conclusion about the risk of groundwater impacts as a result of the Project, FERC made no specific finding about the impacts to any particular wells or cisterns "within 150 feet and up to one mile" from the Project, because at the time of the EA, neither FERC nor Transco had identified any such resources. App. 17. Accordingly, the particular finding that FERC did not "anticipate any significant impacts on cisterns, wells, or septic systems in the Project areas" was based most

39

directly on FERC's understanding that those resources simply did not exist.

Transco and several commenters subsequently notified FERC that there were numerous private wells in the project area. Nevertheless, based on additional assurances from Transco that it would remedy any damage or disruption to the water supply — and without revising the EA or identifying the specific number of potentially impacted wells — FERC issued Transco the certificate, subject to additional monitoring and mitigation conditions. These included the requirement that Transco identify and file the locations of all private wells in the Station 203 project area prior to beginning construction; conduct "pre- and post-construction monitoring of well yield and water quality"; and report to FERC any complaints it receives from well owners and how the complaints were resolved. App. 56. Some of the petitioners challenged the propriety of the certificate, arguing that the underlying assessment of the impact on wells was necessarily insufficient given that it was made without regard to the number of impacted wells. In denying the motion for rehearing, FERC rejected this claim, asserting that the certificate's requirements that Transco identify and monitor the wells, and Transco's promise to "minimize and remediate impacts" and "to repair, replace, or provide alternative sources of potable water" in the event of more permanent impacts, "appropriately identify and mitigate any potential impacts to groundwater resources." App. 87.

On appeal, the petitioners in large part renew the challenge levied before FERC. They add that even if FERC were not absolutely required to identify the number of affected wells, its proposed mitigation plan is inadequate because: (1)

it cannot effectively be enforced, and (2) because without knowing how many wells are potentially impacted, it is impossible to determine whether the proposed mitigation plan will suffice. The petitioners contend that FERC's "no significant impacts" conclusion was therefore arbitrary and capricious because it was not based on sufficient evidence. Because we conclude that FERC sufficiently established the efficacy of the proposed mitigation plan, we will not disturb its conclusion that the Project's groundwater impacts — if any — will not be significant.

When an agency's "proposed mitigation measures [are] supported by substantial evidence, the agency may use those measures as a mechanism to reduce environmental impacts below the level of significance." Nat'l Audubon Soc. v. Hoffman, 132 F.3d 7, 17 (2d Cir. 1997). Mitigation measures will be deemed "sufficiently supported" where "they are likely to be adequately policed," such as where the mitigation measures are included as mandatory conditions in a permit. Id.; Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs, 524 F.3d 938, 955–56 (9th Cir. 2008) (explaining that an "'agency is not required to develop a complete mitigation plan detailing the precise nature . . . of the mitigation measures[,]' so long as the measures are 'developed to a reasonable degree.'" (quoting Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 734 (9th Cir. 2001))).

Nor must the proposed mitigation be included in the original EA in order to pass muster under NEPA. If FERC in its certificate order addresses the commenters' concerns about the adequacy of the EA's analysis and clearly articulates its mitigation plan therein, it takes "the requisite 'hard look' at the impact of the . . . Project on the environment." DRN II, 857

41

F.3d at 401 (quoting NRDC v. Hodel, 865 F.2d 288, 294 (D.C. Cir. 1988)). This is because NEPA's "purpose is not to generate paperwork — even excellent paperwork — but to foster excellent action" and to "[e]nsure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1; Kleppe, 427 U.S. at 409 ("By requiring an impact statement Congress intended to assure [consideration of the environmental impact] during the development of a proposal . . . ."). The command to conduct an EA is not an end in itself, but a means to achieve informed decision-making, and reviewing courts should not elevate the form of the analysis over its substance by requiring that the totality of the relevant information be included in the EA in the first instance. "The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious," Balt. Gas & Elec. Co. v. NRDC, 462 U.S. 87, 97–98 (1983), not to police precisely how — or in what form — the agency engages in the requisite analysis. See, e.g., DRN II, 857 F.3d at 396 (explaining that courts should not "flyspeck" FERC's NEPA analysis and should defer to its expertise "so 'long as the agency's decision is fully informed and well-considered'" (quotation marks omitted) (first quoting Myersville Citizens for a Rural Cmty., Inc. v. FERC, 783 F.3d 1301, 1323 (D.C. Cir. 2015), then quoting Hodel, 865 F.2d at 294)). Where the EA fails to address fully a specific issue but the record makes clear that the agency and public were apprised of the deficiency and that the agency sufficiently considered the matter before making a final decision or permitting actions to be taken, it has fulfilled NEPA's procedural mandate.

FERC determined in the EA that groundwater effects were expected to be temporary, limited, and controlled by Transco's adoption of prophylactic measures to limit sediment discharge. After it learned of the wells' existence, FERC imposed supplementary measures to mitigate and remedy any damage to private wells in the project area, along with a reporting framework to ensure Transco's compliance. We conclude therefore that the record establishes that FERC adequately considered the potential impact to the wells, responded appropriately to the concern, and reasonably concluded that in light of its intervention, any impact would be insignificant. Given that FERC in the EA had already reached a reasoned conclusion regarding the intensity of the expected effects of the construction — which it deemed to be minor and transient — its failure to detail fully the number of wells potentially impacted by this limited impact is insufficient to render its findings arbitrary and capricious. The petitioners do not contend that FERC underestimated how the construction would impact a well in the project area, but only that it has not confirmed how many wells this uncontested calibration would disturb. FERC could reasonably conclude that a consequence whose intensity was unlikely to significantly impact any one resource was likewise unlikely to significantly impact additional — but distinct — instances of that same resource.[14]

This case is therefore unlike the Babbitt case cited by the petitioners, in which the Court of Appeals for the Ninth Circuit rejected the agency's EA that made a no significant

---

[14] Nor have the petitioners advanced any reason to believe that minor passing impacts to several individually owned wells would have cumulatively significant impacts.

impact finding without articulating the expected intensity or expected consequences of the projected environmental effects. See 241 F.3d at 732. The Babbitt case involved the impact of growing cruise ship traffic in the Glacier Bay. The agency recognized that expanded traffic would increase the level of underwater disturbance, the risk of collision with sea life, and the risk of oil spills, and acknowledged that the intensity and effects of such increases on the sea life were "unknown." Id. at 729. Nevertheless, the agency asserted that, with the proposed mitigation, the action would have no significant effect on the environment. Id. In rejecting the sufficiency of the agency's analysis, the court explained that the EA's uncertainty over the intensity of the projected environmental effects necessitated the preparation of the more comprehensive environmental impact statement. Id. at 731–32. Given the agency's failure to quantify the likely intensity or effect of the action, and the agency's failure to impose mandatory mitigation conditions as part of the EA, the court likewise rejected the agency's assertion that its mitigation plan could adequately control these unknown effects. Id. at 734–36.

The issue in Babbitt was not that the agency did not know, for instance, how many sea lions would be impacted by the traffic increase, but rather that it did not know the intensity of impact in the first place. We recognize that in certain circumstances — such as where the intensity of the impact is expected to be moderate or significant — the failure to identify the number of species or resources impacted could render the EA insufficient because the magnitude of gross harm would be too uncertain. That is not the case here, however, where FERC identified the intensity of the impacts and concluded that they would be minor and temporary. Even without knowing the

precise number of wells potentially impacted, FERC could reasonably conclude that the total environmental impact of such low-intensity and fleeting effects would be insignificant, especially when accounting for the mandatory mitigation and remedial conditions imposed upon Transco in the certificate, which FERC has assured the Court that it will enforce.[15]  See

---

[15] The petitioners assert that the mitigation measures are insufficient because Transco is not required to affirmatively report impacted wells and FERC cannot adequately impose remedial measures if Transco fails to comply.  FERC reiterated in its order denying rehearing, however, that if Transco's post-construction testing showed decreased well yield or water quality, FERC has authority to require Transco to mitigate the impact.  App. 88.  FERC's clarification implies Transco's responsibility to inform FERC of any changes.  Moreover, landowners can be expected to complain to Transco if there is a noticeable change in their well's yield or water quality, complaints which Transco is expressly required to pass on to FERC.  If the impacts on the wells are so negligible that the landowner does not even notice them, then such impacts are — as FERC predicts will be the case — insignificant and do not require mitigation.  Finally, the petitioners in their Reply brief do not challenge FERC's authority to enforce any required remediation, which we conclude is amply supported by the applicable federal legislation.  See 15 U.S.C. § 717o (granting FERC the "power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions" of the NGA); id. § 717f ("The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such

45

id. at 735 (recognizing that even where mitigation procedures are not fully developed, "the imposition of special conditions, enforced through a permit," and adequately supervised could "ensure[] that the measures would be enforced in a manner that properly reduced negative environmental impact"). We therefore reject the petitioners' claim that FERC's treatment of the well impacts ran afoul of NEPA.

## C. Need for the Project

FERC must determine that the proposed project "is or will be required by the present or future public convenience and necessity," 15 U.S.C. § 717f(e), prior to granting a certificate of public convenience and necessity under the NGA. This inquiry involves two steps. First, FERC asks whether "the project will 'stand on its own financially' because it meets a 'market need.'" Sierra Club, 867 F.3d at 1379 (quoting Myersville, 783 F.3d at 1309). The point of this step is "to ensure that a project will not [need to] be subsidized by existing customers." Myersville, 783 F.3d at 1309. This element can accordingly be established by the existence of contracts subscribing to the capacity of the project. Id. Second — if market need is shown — FERC will then "balance the benefits and harms of the project, and will grant the certificate if the former outweigh the latter." Sierra Club, 867 F.3d at

reasonable terms and conditions as the public convenience and necessity may require."); id. § 717t-1 (granting FERC the power to impose civil fines of up to $1 million per day for the violation of "any rule, regulation, restriction, condition, or order made or imposed by the Commission under authority of this chapter").

1379.  Whether to grant a certificate is "peculiarly within the discretion of the Commission," Myersville, 783 F.3d at 1308 (quoting Okla. Nat. Gas Co. v. Fed. Power Comm'n, 257 F.2d 634, 639 (D.C. Cir. 1958)), and a reviewing court's task is limited to ensuring that "the decision was based on a consideration of the relevant factors" and not a result of "a clear error of judgment." Id. (quoting ExxonMobil Gas Mktg. Co. v. FERC, 297 F.3d 1071, 1083 (D.C. Cir. 2002)). FERC's findings of fact — such as a finding of need — are conclusive if supported by substantial evidence. 15 U.S.C. § 717r(b).

Applying the above criteria in this case, FERC found "a strong showing of public benefit" based upon NJNG's "binding precedent agreement" to purchase 100 percent of the Project's capacity that outweighed the Project's "minimal adverse impacts," and so granted the certificate. App. 42. The petitioners challenge this finding as arbitrary and capricious because FERC "considered only Transco's asserted need for the Project, ignoring other factual developments" that the petitioners assert "demonstrated that the need was speculative." Pet. Br. 22. Specifically, the petitioners argue that regulatory and legal challenges to both the SRL and PennEast created a "very real possibility that neither" project would be built, which in the petitioners' view would "obviat[e] the need for the Project." Id. FERC rejected this argument in denying the petitioners' motion for rehearing, noting that NJNG's contract was itself sufficient to establish need and that the Project was not reliant on the existence of either the PennEast or SRL. Again, we agree.

The petitioners' argument that the need for the Project is speculative misapprehends the purpose of the analysis, the focus of which is on the objective existence of a market need,

47

not the precise mechanics of fulfilling that need. See, e.g., Sierra Club, 867 F.3d at 1379. A contract for a pipeline's capacity is a useful indicator of need because it reflects a "business decision" that such a need exists. See App. 76. If there were no objective market demand for the additional gas, no rational company would spend money to secure the excess capacity. Cf., e.g., Zoslaw v. MCA Distrib. Corp., 693 F.2d 870, 884 (9th Cir. 1982) (noting that, in the ordinary course, a company's "legitimate business decisions" will not be against their self-interest). In this case, FERC reasonably relied on NJNG's binding contract to utilize all of the Project's capacity — a contract that was not contingent on the completion of either the SRL or PennEast[16] — as evidence of the market need and proof that the Project will be self-supporting. As numerous courts have reiterated, FERC need not "look[] beyond the market need reflected by the applicant's existing contracts with shippers." Myersville, 783 F.3d at 1311 (quoting Minisink, 762 F.3d at 111 n.10).

Even were this not the case, the petitioners' view of the need is myopic. The need is not, as they contend, to provide

---

[16] The petitioners concede that "the precedent agreements may be binding on NJNG" even if the SRL is not built, but curiously insist that this "does not mean the NJNG will remain obligated to continue with the precedent agreement if the SRL is not completed." Reply Br. 5 n.1. We discern no meaning to the word "binding" other than "having legal force to impose an obligation," Black's Law Dictionary (10th ed. 2014), and so fail to understand the petitioners' hypothetical in which a party to a binding agreement is nonetheless free to shirk its enforceable obligations thereunder.

capacity for gas to reach the SRL; this is the means of fulfilling the need, not the need itself. Rather, the "need" is for the provision of "enhanced reliability and resiliency to NJNG's service territory in Monmouth and Ocean Counties," App. 790, which is why NJNG is building the SRL and why it is seeking additional capacity from Transco. This need exists objectively, and independently of the SRL. If for whatever reason NJNG cannot build the SRL as it is proposed, this need for "enhanced reliability and resiliency" will endure, and the Project will still be necessary to meet that need by providing additional capacity for the southward supply of natural gas. Nor, as we explained above, is the Project reliant on PennEast's completion. Thus, FERC correctly determined based on substantial evidence that even if the SRL or PennEast were not built, the Project would still serve the public need. Because the petitioners do not challenge FERC's balancing at step two of the analysis — regarding which FERC is afforded "broad discretion," Minisink, 762 F.3d at 111 — we conclude that FERC properly granted the certificate to Transco.

### D.  Good Faith Notice

The petitioners' next challenge — that, contrary to the requirements of 18 C.F.R. § 157.6(d)(1), Transco failed to provide petitioner Bordentown with notice of Transco's application — likewise fails. Section 157.6(d)(1) required Transco to "make a good faith effort to notify all affected landowners and towns" of its application, within three days of FERC's March 13, 2015 filing of the Notice of Application regarding the Project. We discern no basis in the record to disturb FERC's conclusion that Transco did so.

Most fundamentally, the petitioners' claim is unsupported by any relevant citation to the record, and is belied by FERC's explicit finding in its order granting the certificate that Transco complied with the "intent of the landowner notification requirements." App. 44. This finding, like all FERC fact-finding, is conclusive where supported by substantial evidence. FERC's determination is supported by Transco's submission, filed March 24, 2015, that it had "mailed notices to all affected landowners" and re-mailed to new addresses the notices that were returned undelivered, FERC Docket CP15-89, Submittal 20150324-5228 (Mar. 24, 2015), and FERC's own investigation confirming the submission's accuracy, App. 44, 96. By contrast, the petitioners' claim that Bordentown was not given notice is only a representation in their appellate brief, which does not constitute record evidence, see United States v. Genser, 582 F.2d 292, 311 (3d Cir. 1978), and is in fact contradicted by the record, see, e.g., App. 1735–38 (letters dated September and October 2015 in which Transco's counsel discusses the Project with Bordentown's counsel, and which noted discussions from as early as August 2015). We therefore defer to FERC's fact-finding and conclude that Transco satisfied their good faith notice requirements.[17]

_____

[17] To the extent that the petitioners claim that the alleged failure to provide notice implicated their constitutional rights to Due Process and thus must be subjected to more exacting review, we note that the petitioners at the very least received constitutionally sufficient notice of Transco's project, as evidenced by their participation in the notice and comment period following the EA and their petitioning for rehearing. See All. Pipeline L.P. v. 4.360 Acres of Land, More

In addition, FERC has long maintained that notice published in the Federal Register satisfies the Commission's notice requirements. See App. 97. Given the deference owed to an agency's interpretation of its own regulations, see, e.g., Columbia Gas Transmission, LLC v. 1.01 Acres, More or Less, 768 F.3d 300, 313 (3d Cir. 2014); Marseilles Land & Water Co. v. FERC, 345 F.3d 916, 920 (D.C. Cir. 2003) (explaining that "agencies are entitled to great deference in the interpretation of their own rules" unless the interpretation is "plainly erroneous" (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945))), FERC's view that its statutory notice requirement was satisfied by the notice of the application published in the Federal Register is conclusive of this claim.

---

or Less, 746 F.3d 362, 366 (8th Cir. 2014) (concluding that landowners "received notice 'reasonably calculated . . . to apprise' them of [the company's] FERC application" where, in the months between the company's application and FERC's order granting the certificate, the company negotiated with the landowners to seek an easement and filed a lawsuit for permission to survey the property in relation to the project (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950))); Moreau v. FERC, 982 F.2d 556, 569 (D.C. Cir. 1993) (holding, in a case where parties had actual notice before FERC granted the certificate, that the "Due Process Clause does not require notice where those claiming an entitlement to notice already knew the matters of which they might be notified").

### E. Green Acres Act

The petitioners' penultimate claim is that FERC erred by granting Transco the certificate because it will permit Transco to construct the Project on property subject to regulation under New Jersey's Green Acres Act,[18] without first seeking state-level approval to divert the property to non–Green Acres uses. This argument is facile because the petitioners entirely fail to articulate what portion of its governing law was violated when FERC neglected to seek New Jersey state approval before granting the certificate of public necessity, the authority over which Congress exclusively vested in FERC.

Although the parties primarily dispute whether the Green Acres Act is preempted or whether FERC addressed sufficiently the Act's substantive concerns before granting the certificate, we need not even get that far. Nothing in the NGA, NEPA, or its implementing regulations require FERC to do anything more than at most consider the proposed land-use and

---

[18] The Green Acres Land Acquisition and Recreation Opportunities Act of 1975 ("Green Acres Act") was "designed to provide State funding to assist municipalities with the acquisition and development of property for conservation and recreation" and "required State-level approval of the sale . . . of all conservation or recreational properties" either purchased with, or owned at the time of, the municipality's receipt of the funding. Cedar Cove, Inc. v. Stanzione, 584 A.2d 784, 785 (N.J. 1991).

its alternatives.[19] There is certainly no requirement that prior to issuing a certificate, FERC pass through the procedural hoops that the state places upon the alienation of land subject to its authority. The petitioners' demand that FERC should have proceeded with "caution" in light of New Jersey's exacting regulatory scheme, Reply 16, while laudable, finds no support in the text of FERC's regulations. Given that FERC did not have to receive New Jersey's approval prior to its issuance of the certificate, we cannot conclude that it erred by failing to do so with regard to the Green Acres Act.[20]

---

[19] Although FERC must consider the environmental impacts of the pipeline's siting and to the extent feasible to respect state conservation designations, see, e.g., 18 C.F.R. § 380.15, as a purely process-oriented statute NEPA cannot and does not require FERC to undertake any substantive acts, such as specifically complying with a state's land-use regulations. And the petitioners have not argued on appeal that FERC's consideration of the Green Acres property violated NEPA's procedures.

[20] In any event, we note that FERC's granting of the certificate (thereby accepting that the pipeline would pass through land subject to the Green Acres Act) was not irreconcilable with Transco thereafter going through the process mandated by the Act, which Transco has indeed agreed to do. To the extent that Transco would have had to utilize the right to seek eminent domain that is conveyed by the receipt of the certificate, it would only be because Bordentown — the landowner actually subject to the Green Acres Act — refused to agree to seek a diversion under the Act or because New Jersey refused to permit a diversion. The petitioners' argument suggests to the contrary that the granting of the certificate

If anything, the NGA itself suggests that FERC need not concern itself with the legal technicalities concerning — or the ownership status of — land upon which FERC determines that the placement of a pipeline would be in the public interest. The NGA, 15 U.S.C. § 717f (h), affords certificate holders the right to condemn such property, and contains no condition precedent other than that a certificate is issued and that the certificate holder is unable to "acquire [the right of way] by contract." Two salient points emerge. First, this section places sole responsibility on the certificate holder — not FERC — to secure the legal right to utilize the land at issue. Second, there is no requirement that the certificate holder first attempt to acquire the property via the state's preferred process: if the holder cannot reach an arm's-length agreement with the property owner, then the holder may proceed under § 717f(h).[21] To the extent, then, that any preemption is squarely

immediately condemns the property, notwithstanding state law. This is plainly incorrect, as the certificate merely signals FERC's approval of the Project's siting, based on the assumption that Transco will either receive the landowner's permission to use the property or else exercise its statutory right to condemn the property. Because FERC could issue the certificate and Transco could still (and, in fact, did) thereafter proceed via the Green Acres Act, it is unclear what additional "caution" the petitioners expect FERC to afford to the Green Acres Act scheme or, indeed, how much caution would in their view suffice. Reply 16.

[21] Although the statute directs the United States District Court overseeing the condemnation proceeding to "conform as nearly as may be with the practice and procedure in similar

54

at issue here, the NGA already speaks pellucidly about the hierarchy of land rights, and it is entirely silent about any requirement that the state's existing regulations concerning the land be substantively complied with or respected. Cf. Dominion Transmission, Inc. v. Summers, 723 F.3d 238, 243–45 (D.C. Cir. 2013) (recognizing that the NGA preempts state zoning and land use requirements, save for those enacted under the Clean Air Act, CWA, or Coastal Zone Management Act (citing 15 U.S.C. § 717b(d))).

Finally, we would be remiss not to point out that although the petitioners levy their challenge against FERC's issuance of the certificate, the real target of their claim is actually the Township of Bordentown's interpretation thereof. FERC, in issuing the certificate, did not specifically opine that any particular provision of the Green Acres Act is preempted. See App. 63 (explaining generally in the certificate order that state requirements that "prohibit or unnecessarily delay Transco from meeting its obligations under this Order" are "preempted by the certificate"). To the extent that Bordentown feels compelled to ignore the Green Acres Act as a result of FERC granting the certificate, then it is their (allegedly overbroad) reading of FERC's authority that is to blame. If, conversely, Bordentown concludes that the granting of the certificate does not override the applicability of the Green Acres Act, then "no harm, no foul," as FERC would not

_____

action or proceeding in the courts of the State where the property is situated," this requires district courts to attempt to mirror the state courts' condemnation proceedings, not to adopt the state's administrative scheme concerning the alienation of the land at issue. 15 U.S.C. § 717f(h).

55

— in the petitioners' telling — have exceeded its authority by granting the certificate notwithstanding its failure to consider the Green Acres Act. Put simply, "[u]nder either interpretation, the certificate order has only whatever preemptive force it can lawfully exert, and no more." Myersville, 783 F.3d 1321. Because FERC, when issuing the certificate, did not "purport to compel" Bordentown to undertake an act inconsistent with the NGA, and because "no provision of the [NGA] identified by [the p]etitioners barred [FERC] from issuing a conditional . . . certificate under these circumstances," the petitioners' Green Acres Act challenge fails. Id.

## F. Cumulative Error

The petitioners finally ask that we grant the petition based on the cumulative effect of FERC's various alleged errors. Under the cumulative error doctrine — which we have to date applied only in the context of criminal trials — a court "may determine that, although certain errors do not require relief when considered individually, the cumulative impact of such errors may warrant a new trial." SEC v. Infinity Grp., 212 F.3d 180, 196 (3d Cir. 2000). We need not decide whether the cumulative error doctrine applies in this type of case, because even assuming its applicability, our conclusion that none of FERC's challenged decisions were individually erroneous forecloses a cumulative error claim. See id.

## IV. Challenges to the NJDEP's Order

We now turn to the petitioners' challenge to the NJDEP's conclusion that the New Jersey regulations establishing the availability of adjudicatory hearings to contest

the grant of water quality permits to an interstate pipeline project were preempted by federal law (docket No. 17-3207). As noted above, we conclude that the NJDEP misunderstood the scope of the NGA's assignment of jurisdiction to the federal Courts of Appeals. Because this erroneous view was the only articulated reason for its denial of the petitioners' hearing request, we will remand to the NJDEP for reconsideration of the petitioners' request and to give the NJDEP the opportunity to in the first instance address the petitioners' substantive challenges to the provision of the permits.

## A. Jurisdiction Under the NGA

We begin with the language of the federal statute that the NJDEP purports divests it of jurisdiction to grant adjudicatory hearings arising from permit decisions affecting interstate natural gas pipelines. Under the NGA:

> The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a . . . State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval . . . required under Federal law . . . .

15 U.S.C. § 717r(d)(1). By the plain language of the statute, the conferral of "original and exclusive jurisdiction" to the federal Courts of Appeals is limited to "civil action[s] for the

57

review of an order or action of a Federal agency . . . or State administrative agency." Id. The term "civil action" is not defined either in § 717r or anywhere in the NGA, so we must "look to the common meaning of the term in deciding whether 'civil action' encompasses" a state administrative proceeding, as the NJDEP claims. Schindler v. Sec'y of Dep't of Health & Human Servs., 29 F.3d 607, 609 (Fed. Cir. 1994). Our review assures us that a "civil action" refers only to civil cases brought in courts of law or equity and does not refer to hearings or other quasi-judicial proceedings before administrative agencies.

The Supreme Court has recognized that "the word 'action' often refers to judicial cases, not to administrative 'proceedings,'" West v. Gibson, 527 U.S. 212, 220 (1999), and has parsed statutes based on Congress's understanding of the distinction between a civil "action" in a court and an administrative "proceeding" at the agency level, New York Gaslight Club, Inc. v. Carey, 447 U.S. 54, 60–62 (1980). This Court, for its part, has held in the context of interpreting a statute providing for attorneys' fees in taxpayer disputes against that IRS that the even broader term "'civil action or proceeding' includes only judicial proceedings and not administrative actions." Toner v. Comm'r, 629 F.2d 899, 902 (3d Cir. 1980). Our sister Courts of Appeals have reached similar conclusions. In Schindler, for instance, the Court of Appeals for the Federal Circuit noted that "[u]nder Fed. R. Civ. P. 3, a 'civil action' is commenced by the filing of a complaint with the court," and quoted Stroud's Judicial Dictionary's definition of "'civil action' as 'litigation in a civil court for the recovery of individual right or redress of individual wrong.'" 29 F.3d at 609–10. In another case, that court explicitly stated that a hearing "at the administrative level" was not "in a 'civil action.'" Levernier Const., Inc. v. United

58

States, 947 F.2d 497, 502 (Fed. Cir. 1991); see also, e.g., Howard v. Pritzker, 775 F.3d 430, 432 (D.C. Cir. 2015) (distinguishing, in the Title VII context, between the "final administrative action" and the subsequent "civil action" consisting of "a de novo court proceeding"). Black's Law Dictionary similarly defines an "action" as a "civil or criminal judicial proceeding." Black's Law Dictionary 31 (8th ed. 1999); see also Ballentine's Law Dictionary 202 (3d ed. 1969) (defining a civil action" as "any proceeding in a court of justice by which an individual pursues that remedy which the law affords him"); Bouvier Law Dictionary Desk Edition (2012) (defining a "civil action" as "[a]ll actions in law or equity that are not criminal actions" and noting that it is "the generic term for all lawsuits").

The Supreme Court has long recognized that administrative hearings, even to the extent that they in some ways mirror an adversarial trial, do not constitute proceedings in courts of law or equity. See, e.g., Dixon v. Love, 431 U.S. 105, 115 (1977) (holding that "procedural due process in the administrative setting does not always require application of the judicial model"); Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229–30 (1938) (explaining that the purpose of the section of the NLRA at issue there, which freed an administrative tribunal from applying the rules of evidence required "in courts of law and equity," was to "free administrative boards from the . . . technical rules" inherent "in judicial proceedings"). And notably, the New Jersey Supreme Court has explicitly held, in upholding the constitutionality of an administrative body tasked with adjudicating allegation of unlawful discrimination, that administrative adjudication "involves no . . . intrusion upon subject matter jurisdiction of

the judicial branch over traditional causes of action at law or in equity." David v. Vesta Co., 212 A.2d 345, 359 (N.J. 1965).

Viewed in light of both federal and New Jersey authority, and barring any specific statutory language to the contrary, a hearing before an administrative body is not a "civil action." Accordingly, such hearings are not impacted by § 717r(d)(1)'s assignment to the federal Courts of Appeals the exclusive jurisdiction over civil actions challenging a state agency's permitting decision made pursuant to federal law. Because, as relevant here, the NGA explicitly permits states "to participate in environmental regulation of [interstate natural gas] facilities" under the CWA, Delaware I, 833 F.3d at 368, and only removes from the states the right for their courts to hear civil actions seeking review of interstate pipeline–related state agency orders made pursuant thereto, the NGA leaves untouched the state's internal administrative review process, which may continue to operate as it would in the ordinary course under state law.

That § 717r(d)(1)'s scope is limited to judicial review of agency action, and does not implicate or preempt state agency review of the agency's own decision, is also apparent from the statute's structure. For example, § 717r(b) — which is titled "Review" and discusses appeals to the Courts of Appeals from a FERC order — allows a party "aggrieved by an order issued by the Commission" to "obtain a review of such order" in the Courts of Appeals. In contrast, § 717r(d)(1) — which is titled "Judicial review" — grants "original and exclusive jurisdiction over any civil action for the review of an order or action of a . . . or State administrative agency." (emphasis added). Congress therefore clearly understood the difference between establishing direct judicial

60

"review" over agency action (supplanting any alternative intra-agency process) and creating an exclusive judicial forum in the federal Courts of Appeals for a "civil action" challenging an agency's decision-making (separate from the agency's own internal review process). As opposed to affirmatively installing federal courts to oversee the administrative process, as it did in § 717r(b) by placing the "review" of all FERC action in the Courts of Appeals, Congress did not interject federal courts into the internal workings of state administrative agencies. See Berkshire Envtl. Action Team, Inc. v. Tenn. Gas Pipeline Co., 851 F.3d 105, 112–13 (1st Cir. 2017) ("We see no indication that Congress . . . intended to dictate how (as opposed to how quickly) [the state agency] conducts its internal decision-making before finally acting."). The myriad "state procedures giving rise to orders reviewable under § 717r(d)(1) may (and undoubtedly do) vary widely from jurisdiction to jurisdiction," some of which may permit intra-agency review and others which may not. Id. at 109. Perhaps in recognition of this diversity, § 717r(d)(1) merely establishes that a party who seeks judicial review of a state agency decision via a collateral civil action challenging the correctness of the decision, may only bring that civil action directly to the federal Courts of Appeals, not the state courts or federal district courts.

Finally, although not squarely faced with this issue, this Court and the Court of Appeals for the First Circuit have implicitly held that state administrative review of interstate gas permitting decisions is not preempted by the NGA. In our recent opinion in Delaware Riverkeeper Network v. Secretary Pennsylvania Department of Environmental Protection, Nos. 16-2211, 16-2218, 16-2400 (3d Cir. Sept. 4, 2018) ("Delaware III"), as well as in Delaware II and Berkshire, the courts

61

considered whether § 717r(d)(1) includes a finality requirement such that the federal Courts of Appeals lack jurisdiction to hear the case if the state makes available additional administrative remedies before the permitting decision takes effect. If the NJDEP's and Transco's position in this case were a correct reading of the statute (that "any civil action for the review" in § 717r(d)(1) includes administrative review), then those courts would not have considered whether administrative review was an available or mandatory remedy in the state's administrative scheme, because the NGA would have cut off any state review other than the initial decision, making that decision by default final. In Delaware II, however, this Court assumed that the petitioners could have sought an appeal to the Pennsylvania Environmental Hearing Board ("EHB") if they had done so within the time period provided in the Pennsylvania statute. See 870 F.3d at 177. And in deciding the issue left open by Delaware II, we concluded in Delaware III that the Pennsylvania DEP's issuance of a Water Quality Certification was final and appealable to this Court "[n]otwithstanding the availability of an appeal to the EHB." Delaware III, slip op. at 18. Although reaching the opposite conclusion in regards to the finality of the Massachusetts permitting process, the court in Berkshire determined in light of that state's administrative scheme that it did not have jurisdiction to hear the case until the state environmental agency held the adjudicatory hearing that petitioners had sought, and issued an order thereupon. See 851 F.3d at 112–13.[22] If the plain impact of § 717r(d)(1) was to remove from

_____

[22] In Delaware II and III, we distinguished Berkshire on the basis that the Pennsylvania statute allowed construction to begin immediately upon the issuance of the agency's decision,

62

the states any and all review over the issuance of such permits, those cases would not have proceeded based on the understanding — express or implicit — that state administrative review was available if desired. The only

_____

whereas the Massachusetts statute at issue in <u>Berkshire</u> did not allow any action on the permit until the expiration of the period for seeking an adjudicatory hearing. For present purposes, however, the technical details of the state's administrative scheme are irrelevant. If the NJDEP and Transco are correct that the clear text of the statute demands that all review of permitting decisions must occur in this Court only, it would be counterintuitive to assert that we will ignore the statute's mandate and permit administrative review in contexts where the state's administrative scheme established that an initial decision is not final until the parties have an opportunity for review. <u>Cf.</u> <u>Delaware III</u>, slip op. at 12–13 ("Although the decisionmaking process we are reviewing is defined by Pennsylvania law, we nevertheless apply a federal finality standard to determine whether Congress has made the results of that process reviewable under the [NGA]."). Rather, accepting the NJDEP's and Transco's view, the statute — by eliminating any review other than federal Court of Appeals review — would operate to make final the state's initial permitting decision, notwithstanding whatever administrative review scheme the state otherwise had in place. Nor, for that matter, do the NJDEP or Transco assert that any such carve-out exists for state schemes that create a single or unitary proceeding that includes administrative review. But as we made clear in <u>Delaware III</u>, such distinctions in the state administrative scheme are "probative of whether that decision is final." <u>Id.</u> at 16.

plausible conclusion to draw from these cases and from the text of the statute itself is that § 717r(d)(1) does not preempt state administrative review of interstate pipeline permitting decisions.

## B. New Jersey Law

Having decided that the NGA does not preempt the regular operation of New Jersey's administrative review process, we turn next to the determination of whether the NJDEP's refusal to afford the petitioners an adjudicatory hearing based on the NJDEP's erroneous interpretation of the NGA amounts to a violation of New Jersey law. As explained below, we conclude that it does.

Federal courts reviewing state agency action afford the agencies the deference they would receive under state law. See, e.g., Delaware II, 870 F.3d at 181. Accordingly, we look to New Jersey law to determine the prism of our review of the NJDEP's denial of the petitioners' request for an adjudicatory hearing. Similar to review under the APA, judicial review of New Jersey administrative agency decisions is generally limited to a determination of whether the decision "is arbitrary, capricious or unreasonable," but no deference is owed to "the agency's interpretation of a statute or its determination of a strictly legal issue." In re Taylor, 731 A.2d 35, 42 (N.J. 1999) (quoting Mayflower Sec. Co. v. Bureau of Sec., 312 A.2d 497, 501 (N.J. 1973)). Likewise, we afford no deference to a state agency's interpretation of federal law, which we instead review de novo. See, e.g., MCI Telecomm. Corp. v. Bell Atl. Pa., 271 F.3d 491, 516 (3d Cir. 2001).

The NJDEP regulations implementing the FWPA allow a party to request an adjudicatory hearing to challenge the grant of an FWW permit. The FWPA explicitly provides for the availability of such a hearing where the requestor is the permit seeker, N.J. Stat. Ann. § 13:9B-20, and — as recognized in the NJDEP regulations, see N.J. Admin. Code § 7:7A-21.1(e) (FWW); § 7:14A-17.2(c) & (f) (dewatering) — the New Jersey Administrative Procedure Act recognizes the rights of "[p]ersons who have particularized property interests or who are directly affected by a permitting decision" to such a hearing, N.J. Stat. Ann. §§ 52:14B-3.1(b) & 3.2(c).[23] Under its regulations, when a third party asserting such a property interest seeks an adjudicatory hearing regarding a permit, the NJDEP has the responsibility in the first instance to either deny the request — and in doing so to provide the reasons for the denial — or to approve the request and to forward the matter to the Office of Administrative Law, where an ALJ will hear the dispute and then issue a report and recommendation for the consideration of the NJDEP Commissioner. N.J. Admin. Code § 7:7A-21.1(f)–(g), 7:14A–17.5(b); see also N.J. Stat. Ann. § 52:14B-10(a)–(c). Although the FWW regulations do not articulate a standard by which the agency must decide whether to approve or deny a petition for an adjudicatory hearing, the denial of a request for a hearing on a dewatering permit is

[23] The petitioners assert that they meet this standard. In denying the petition for a hearing, the NJDEP expressly withheld decision on the claim, NJDEP App. 37 n.4, and neither the NJDEP nor Transco address this fact-specific issue on appeal. Given our disposition, we need not reach the issue, which we leave for the NJDEP to address in the first instance when reconsidering the petitioners' hearing request.

65

limited to an enumerated list of reasons. N.J. Admin. Code §§ 7:7A-21.1(f); 7:14A–17.4. In either case, the NJDEP must clearly articulate the reasoning behind its decision so that a reviewing court can determine whether the decision was in error. See id. §§ 7:7A-21.1(f); 7:14A–17.4(e); see also In re Authorization For Freshwater Wetlands Statewide Gen. Permit 6, Special Activity Transition Area Waiver For Stormwater Mgmt., Water Quality Certification, 80 A.3d 1132, 1147 (N.J. App. Div. 2013); Atl. City Med. Ctr. v. Squarrell, 793 A.2d 10, 16 (N.J. App. Div. 2002).

Here, the NJDEP denied the petitioners' request for an adjudicatory hearing on the FWW and dewatering permits on the sole basis that, pursuant to the NGA, the federal Courts of Appeals have exclusive jurisdiction to hear any challenges to final decisions granting permits, and accordingly that the provisions permitting an adjudicatory hearing to contest such decisions were preempted.[24] Because we conclude that the NJDEP's reading of the NGA was erroneous as a matter of law and that the NGA does not preempt the regular progression of intra-agency review of a permitting decision, the NJDEP's denial of the petitioners' request for an adjudicatory hearing

---

[24] We need not determine whether or not a NJDEP permitting decision is already final during the period when a party may still seek an adjudicatory hearing to challenge the permit because, as explained below, the fact that we may have immediate jurisdiction to hear a challenge to a permitting decision does not mean that the agency charged with administering the permitting process is thereby divested of its authority to review challenges to its permits via its established administrative procedures.

based on that misunderstanding was unreasonable and so cannot stand.

The NJDEP and Transco urge that jurisdiction properly lies in this Court because the permit decision was final and because requiring exhaustion of state remedies would run counter to the NGA's purpose of streamlining natural gas permits. This may be so. However, the determination of whether we may assert jurisdiction immediately upon a permitting decision does not answer whether the agency is simultaneously stripped of jurisdiction to provide an administrative adjudicatory hearing in the ordinary course. Our limitation to considering only final orders, see Delaware III, slip op. at 10, is a constraint on our own jurisdiction, not a determination that we are the only forum available to consider final orders.[25] Indeed, if the NJDEP and

_____

[25] In other words, our own limitation to hearing only final orders is not necessarily tantamount to creating an exhaustion requirement in the state process. See, e.g., Delaware III, slip op. at 17 ("[F]inality is 'conceptually distinct' from the related issue of exhaustion of administrative remedies." (quoting Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 192 (1985))); Berkshire, 851 F.3d at 110 (explaining that "[f]inding that a statute requires final agency action is different from finding that it requires exhaustion" (citing Darby v. Cisneros, 509 U.S. 137, 144 (1993))). Assuming that a state considers an order final even though additional state agency procedures may be available — and that the classification is consistent with federal finality standards — we may consider a judicial challenge to the order despite the petitioner's failure to exhaust

Transco are correct that the NJDEP orders at issue here were final when issued, see Transco Br. 24; NJDEP Br. 10, 12, New Jersey clearly provides for a 30-day window to seek an adjudicatory hearing to contest that final order.  We therefore do not necessarily disagree with the NJDEP and Transco's assertion that the petitioners could have immediately appealed the NJDEP's orders to this Court.  Nor do we disagree that, assuming the petitioners sought immediately to bring such a civil action — and again putting aside the question of finality — this Court would be the only judicial body to which such a challenge could be brought.  Our holding is only that (1) instead of bringing a civil action in this Court, the petitioners were entitled under New Jersey law to have alternatively first sought an intra-agency adjudicative hearing, and (2) the NJDEP violated New Jersey law by unreasonably denying the petitioners' request for such a hearing based on its misreading of the NGA and this Court's precedent.

In sum, although the plain language of the NGA strips state courts — as well as federal district courts — of jurisdiction to hear civil actions challenging an administrative agency's permitting decision regarding interstate natural gas pipelines, it does not purport to meddle with the inner workings of the agency's approval process or to insert federal appellate

those further state administrative remedies.  See Delaware III, slip op. at 12–13, 17.  And conversely, even though a petitioner might have the right immediately to commence a civil action in this Court, this does not necessarily extinguish his or her right instead to seek redress via the available administrative avenues before filing that civil action.

courts arbitrarily into the state administrative scheme. The language of the statute merely requires that judicial challenges to the outcome of the administrative process come straight to us. If, however, a state allows for an internal administrative review of a permitting process, such a process does not contravene the NGA. Because the NJDEP denied the petitioners' request for an adjudicatory hearing based on its belief to the contrary, we will remand to the agency with instructions to reconsider the petitioners' request for a hearing in light of our clarification. In doing so, we express no opinion on the petitioners' ultimate entitlement to an adjudicatory hearing based on New Jersey law.

## V. Conclusion

In light of the foregoing, we will deny in part and grant in part the petitions for review, and remand to the NJDEP for proceedings consistent with this opinion.